Joseph C. SPAGNOLA, Jr.

v.

William MATHIS, et al.,
Appellants. (Two Cases)

Joseph C. SPAGNOLA, Jr., Appellant,

v.

William MATHIS, et al.

Nos. 84–5530, 84–5659 and 84–5822.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 7, 1986.

Decided Dec. 5, 1986.

Rehearing En Banc Granted in Part
Jan. 6, 1987.

Stuart H. Newberger, Asst. U.S. Atty.,
with whom Joseph E. diGenova, U.S. Atty.,
and R. Craig Lawrence, Royce C. Lam-
berth, and Michael J. Ryan, Asst. U.S. At-
tys., Washington, D.C., were on brief, for
appellants in Nos. 84–5530 and 84–5659 and
cross-appellees in No. 84–5822.

George M. Chuzi, Washington, D.C., for
appellee in Nos. 84–5530 and 84–5659 and
cross-appellant in No. 84–5822.

Before WALD, Chief Judge,
SILBERMAN, Circuit Judge, and
WRIGHT, Senior Circuit Judge.

Opinion for the court filed by Senior
Circuit Judge WRIGHT.

Opinion concurring in part and
dissenting in part filed by Circuit Judge
SILBERMAN.

J. SKELLY WRIGHT, Senior Circuit
Judge:

These three consolidated appeals princi-
pally concern the extent to which Congress,
by enacting the Civil Service Reform Act of
1978 (CSRA), Pub.L. No. 95–454, 92 STAT.
111 (codified as amended in scattered sec-
tions of 5 U.S.C.), may permissibly have
limited federal employees' avenues of relief

for violations of their constitutional and statutory rights. Joseph C. Spagnola, Jr., a federal employee and appellee and cross-appellant in this case, sought monetary and injunctive relief for alleged violations of his rights under the First Amendment and 42 U.S.C. § 1985(1) (1982) against two of his superiors, William Mathis and William Hunter (appellants and cross-appellees) in their individual capacities. The District Court granted appellants' motion to dismiss Spagnola's First Amendment *Bivens* claim, *see Bivens v. Six Unknown Named Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), but refused to dismiss the § 1985(1) claim or to grant summary judgment to appellants based on their defense of qualified official immunity. Spagnola has appealed the dismissal of his *Bivens* action; appellants have appealed the District Court's rejection of their qualified immunity defense; and the District Court has properly certified the § 1985(1) issue to this court pursuant to 28 U.S.C. § 1292(b) (1982). For the reasons hereinafter stated, we reverse the District Court's holding regarding both the *Bivens* [1] and the § 1985(1) claims and affirm its disposition of appellants' immunity defense.

## I. BACKGROUND

### A. *Facts*

Because we review a claim for dismissal pursuant to Fed.R.Civ.P. 12(b)(6) and a motion for summary judgment by appellants, we accept appellee Spagnola's allegations as true for purposes of review. *See Shear v. National Rifle Ass'n,* 606 F.2d 1251, 1253 (D.C.Cir.1979) (complaint should be liberally construed for determination of 12(b)(6) motion); *Abraham v. Graphic Arts Int'l Union,* 660 F.2d 811, 814 (D.C. Cir.1981) (facts asserted by non-moving party in motion for summary judgment should be taken as true if adequately buttressed by evidentiary material).

At all times relevant to this action, Spagnola was employed as a procurement specialist by the Federal Acquisition Institute (FAI), which is part of the Office of Federal Procurement Policy (OFPP) of the Office of Management and Budget (OMB). The events giving rise to this suit began in 1977 when the FAI entered a sole-source, non-competitive contract with American University to develop an undergraduate program in procurement and federal assistance. Spagnola believed that the contract should have been subject to competitive bidding by other local institutions, several of which had already developed procurement programs. He also believed that the FAI was guilty of mismanagement and conflicts of interest in its issuance of the contract.

In 1979 appellant Hunter became Acting Director of the FAI and instructed Spagnola to review all contract actions taken by the agency. Spagnola prepared a report detailing the mismanagement of the contract and the conflicts of interest involved. In June 1979 Hunter called a staff meeting at which Spagnola was present and complained about the report, warning Spagnola:

> I have a long memory and if I get to be Director some of you may not get promoted into Assistant Director positions ... [M]aybe you think you are safe as a GS–14, but there are ways to get to people; maybe when a RIF (reduction in force) situation comes up ...

Verified Complaint For Relief From Violations of First Amendment Rights, August 19, 1983, at 5, Joint Appendix (JA) 10. Spagnola subsequently completed the report and gave it to Hunter. Although Spagnola had been serving at a GS–15 level for several years, Hunter refused there-

---

**1.** The panel is aware that a separate opinion issued today, *Hubbard v. EPA,* 809 F.2d 1, holds to the contrary on this precise issue. Because both cases presented issues other than the one in conflict, the two panels, after consulta- tion, decided to issue the two opinions despite the conflict. The judges on each panel recommend that the issue in Part II of *Spagnola* and Part III of *Hubbard* be heard *en banc* so as to resolve the conflict.

after to promote him beyond his GS–14 grade.

In the fall of 1980 appellant Mathis became Principal Associate OMB Administrator for the OFPP. Mathis approached Spagnola to discuss the management of the FAI. Spagnola told Mathis about the 1979 report on the American University project and also reported Hunter's use of federal funds, personnel, and equipment to complete his doctoral dissertation. Following this conversation, Mathis and Hunter began to conspire to prevent Spagnola from "perform[ing] his duties relating to government contracts." *Id.* at 6, JA 11.

In September 1981 they arranged to have Spagnola assigned for ninety days to a Federal Acquisition Research (FAR) project in Virginia. This three-month assignment was repeatedly extended until March 1983. During this assignment, in June 1982, appellants summoned Spagnola's supervisor, Commander Jack Summers, to a meeting, where they asked him to give Spagnola a poor performance appraisal in order "to get something on [him]." *Id.* at 7, JA 12. When Commander Summers protested that Spagnola's performance did not warrant a poor appraisal, Mathis warned Summers that Mathis might get someone in the office of the Secretary of Defense to order him to write a poor evaluation.

Mathis subsequently telephoned Harvey Gordon, Summers' supervisor, to prevent Spagnola from receiving a GS–15 position in Gordon's office for which he had applied. In September 1982 and March 1983 OFPP advertised a vacancy for a GS–15 position. Spagnola was the only applicant for the position, but he was not selected because OFPP "recruited an individual with [inferior] credentials * * *, wrote his resume, re-wrote the position in an attempt to tailor it to his qualifications, and then selected him even though the Office of Personnel Management had declined to find him eligible." *Id.* at 8, JA 13. At a meeting of employees the selecting official observed that "the only person being injured [by the

method of filling the position] is Spagnola." *Id.* Finally, in July 1983 appellant Hunter approached an employee whose position required that he work with Spagnola and warned him that he "should know better than to hang around with unsavory characters like Spagnola." *Id.*

### B. *Procedure*

In the summer of 1982 Spagnola filed a complaint with the Office of Special Counsel (OSC) of the Merit Systems Protection Board (MSPB) alleging that the American University contract involved gross waste and mismanagement. The OSC refused to investigate, suggesting instead that Spagnola file charges with the OSC that appellants' conduct toward him constituted "prohibited personnel practices" in violation of 5 U.S.C. § 2302(b)(8)(A)(ii) (1982). Spagnola filed such charges in October 1982 and updated and augmented his allegations in November 1982 and March 1983. In February 1985 the OSC notified Spagnola that it had completed its investigation and, because it had found insufficient evidence of prohibited personnel practices or other violations, would take no further action.

In August 1983, after engaging the OSC process but before the OSC's decision not to prosecute, Spagnola filed suit in the District Court, alleging violations of his rights under the First Amendment and 42 U.S.C. § 1985(1). The District Court dismissed the First Amendment claim, citing *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). It denied defendants' motion to dismiss the statutory claim, however, holding that the complaint stated a cause of action under § 1985(1). In addition, the court denied defendants' motion for summary judgment, rejecting their claim of qualified official immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Spagnola appealed the dismissal of his First Amendment claim. Defendants appealed the denial of summary judgment, noting that a denial of immunity is immediately appealable in this circuit. *See*

*McSurely v. McClellan,* 697 F.2d 309, 315–16 (D.C.Cir.1982). The District Court properly certified the § 1985(1) issue to this court, and we consolidated all three appeals.

II. THE FIRST AMENDMENT *Bivens* CLAIM*

It is well settled that the federal courts have power to grant relief not explicitly authorized by Congress. In a series of cases beginning with *Bivens v. Six Unknown Named Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (permitting suit for violation of Fourth Amendment rights), the Supreme Court has held that the Constitution itself permits a private cause of action for damages against a federal official. *See also Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1970) (violation of rights under Due Process Clause of Fifth Amendment); *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (violation of Eighth Amendment rights). This circuit has expressly held that a *Bivens* action exists to enforce the First Amendment, the constitutional provision under which Spagnola is suing. *See Dellums v. Powell,* 566 F.2d 167, 195 (D.C.Cir.1977).

The Supreme Court has held that *Bivens* actions are available in all but two situations. First, a *Bivens* action is precluded if Congress explicitly declares an equally effective remedy to be a substitute for recovery directly under the Constitution. *See Bivens,* 403 U.S. at 397, 91 S.Ct. at 2005; *Davis,* 442 U.S. at 245–47, 99 S.Ct. at 2277–

78; *Carlson,* 446 U.S. at 18–19, 100 S.Ct. at 1471. Second, plaintiffs may not bring a *Bivens* suit when defendants demonstrate "special factors counselling hestitation in the *absence* of affirmative action by Congress." *Bivens,* 403 U.S. at 396, 91 S.Ct. at 2004; *Davis,* 442 U.S. at 245, 99 S.Ct. at 2277; *Carlson,* 446 U.S. at 18, 100 S.Ct. at 1471 (emphasis added). The first situation is inapplicable here, because nowhere in the CSRA does Congress explicitly declare its remedies to be exclusive or equally effective to a *Bivens* action. Thus the availability of a *Bivens* suit to Spagnola turns on whether there are "special factors" in this case suggesting that the generally available judicial remedy is inappropriate.[2]

In *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), the Supreme Court found such "special factors" in the administrative and judicial remedies available to a demoted federal employee and ruled that he was precluded from bringing a *Bivens* action against his superiors for their retaliation in response to the exercise of his First Amendment rights. The Court noted that employees subject to demotion were "protected by an elaborate, comprehensive scheme" that afforded "administrative and judicial [procedures] by which improper action may be redressed." *Id.* at 385, 103 S.Ct. at 2415.[3] Bush's elaborate procedural protections included thirty days' written notice of his demotion, accompanied by the agency's reasons and a copy of the

---

* Vacated by order granting rehearing en banc, infra at 40.

**2.** The dissent misreads our opinion when it asserts that "the majority proceeds to * * * base its holding on the same 'alternative remedy' analysis that it already conceded was irrelevant to the case." Dissent at 37. Nowhere in our opinion do we inquire whether the CSRA provides remedies that are "equally effective" to a *Bivens* action or "explicitly endorsed" by Congress. Instead, we quite clearly embrace the "special factors" analysis adopted by the Supreme Court in *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), and ask whether Spagnola's remedies under the SCRA

may accurately be deemed "meaningful" in the way that Bush's were. The dissent similarly mischaracterizes the extensive circuit precedent favorable to Spagnola's *Bivens* claim as embracing an "alternative remedy" rather than a "special factors" approach. *See* dissent at 38; text at 24–25 *infra* (responding to dissent's mischaracterization). Such offhand and unsupported mischaracterization is incapable of rebutting either our analysis or its unambiguous support in this circuit's precedent.

**3.** These protections are substantially similar to those now afforded to employees subject to "adverse actions" under the CSRA. *See 5 U.S.C.* §§ 7511–7513, 7703 (1982).

charges; the right to examine disclosable materials that formed the basis of the action; the right to answer the charges and to make an oral presentation to an agency official; and review of the official's initial decision through the Civil Service Commission's appeals process,[4] and by the federal courts. Bush successfully invoked these protections and was reinstated and awarded approximately $30,000 in back pay. The Court found these "meaningful remedies," *id.* at 368, 103 S.Ct. at 2406, to be "constitutionally adequate." *Id.* at 378 n. 14, 103 S.Ct. at 2412 n. 14. The Court's decision to preclude a *Bivens* action relied both on its finding that Congress intended Bush's elaborate CSRA remedies to be exclusive and on its independent determination that Congress' remedies were indeed adequate as a constitutional matter. *See id.* at 389, 103 S.Ct. at 2417 (noting that Congress rather than courts should decide the availability of *Bivens* remedy); *id.* at 386, 103 S.Ct. at 2415 (noting that Congress' remedies in this case are meaningful).

Appellants urge and the District Court ruled that, despite the different factual setting in this case, Spagnola's situation is sufficiently like that of Bush that the outcome should be the same. We cannot agree. The Supreme Court's opinion in *Bush* left unanswered both what we may assume Congress intended when its remedial scheme is *less* comprehensive than the CSRA's provisions for review by the MSPB and the federal courts, and what remedies are "adequate" or "meaningful" *short* of those afforded Bush. The provisions of the CSRA that cover Spagnola's case vary significantly from those applicable to employees like Bush, and the adequacy of Spagnola's remedies is necessarily affected.[5]

Because Bush was subject to the "adverse action" of demotion, he was afforded a forum in which to bring his claim and review of that forum's decision by both the MSPB and the federal courts. 5 U.S.C. §§ 7511–7513, 7703 (1982). In contrast, because Spagnola suffered only retaliatory harassment and lack of promotion, his only remedy, other than the agency's internal grievance process, *see* Federal Personnel Manual, ch. 771 (Oct. 1981); OMB Manual § 355 (April 1982)[6] was a request to the Office of Special Counsel of the MSPB to

---

4. The CSRA gave the Commission's adjudicative functions to the Merit Systems Protection Board. 5 U.S.C. §§ 1205, 7701 (1982).

5. The dissent attempts to parse the *Bush* opinion so minutely as to read out the Supreme Court's emphasis on the adequacy of Bush's CSRA remedies in precluding his *Bivens* claim. *See* dissent at 37 & n. 12. The dissent insists that *Bush's* use of the phrase "meaningful remedies," 462 U.S. at 368, 386, 103 S.Ct. at 2406, 2415, describes "the entire set of remedies provided by the comprehensive CSRA system." Dissent at 37 n. 12. Yet the repetition of this phrase on p. 386, 103 S.Ct. p. 2415, of the *Bush* opinion quite clearly refers to Bush's particular remedies under the CSRA, detailing them specifically. But more generally, the dissent simply brushes aside, as no other court has done, the Supreme Court's prominent and emphatic repetition that Bush's particular remedies were meaningful and constitutionally adequate. The 9th Circuit, which recently decided precisely the issue we decide today, cogently explained in its opinion:

[W]e regard as essential to the *Bush* holding the availability of a meaningful remedy for the alleged violation. * * * *Bush* cannot be read apart from its pervasive emphasis on the remedies provided by Congress for the complaining employee in that case * * *.

*Kotarski v. Cooper,* 799 F.2d 1342, 1346–47 (9th Cir.1986). And even the 4th Circuit's opinion in *Pinar v. Dole,* 747 F.2d 899 (4th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985), on which the dissent relies, recognized that *Bush* requires an inquiry into the constitutional adequacy of statutory remedies before a *Bivens* suit is precluded. *See id.* at 908 (concluding that "Pinar was afforded constitutionally adequate procedures"). The dissent's rather astonishing conclusion that the *Bush* opinion "did not rest" on the meaningfulness of Bush's remedies, dissent at 37, runs counter to the clear language of the Supreme Court and to the common understanding even of those who disagree on the outcome of the thorny *Bivens* issue.

6. The internal grievance procedure is clearly not constitutionally adequate so as to bar a *Bivens* action. *See* OMB Manual § 355: Griev-

investigate and prosecute his claims. 5 U.S.C. § 1206 (1982). The OSC's decision not to prosecute Spagnola's constitutional claims is unreviewable either within the agency or by the federal courts. If appellants' attempt to have Spagnola discharged had been successful, Spagnola would have been protected by the full panoply of CSRA procedures, as was Bush, and a *Bivens* action would have been foreclosed. The question before us now is whether the OSC petition afforded by the CSRA also precludes Spagnola's pre-existing right to a *Bivens* action. We conclude both that Congress did not intend to foreclose Spagnola's resort to *Bivens* and that such a limitation on Spagnola's avenues of redress would not afford a constitutionally adequate remedy for vindication of his First Amendment rights. We reach the constitutional issue because we assume that Congress meant to stay within constitutional bounds, and the inadequacy of the OSC remedy thus illuminates our inquiry into congressional intent.

Appellants' argument and the District's Court's opinion rely on the assumption that Congress, in passing the CSRA, intended to eclipse *Bivens* actions for federal employees in Spagnola's situation. *See* Reply Brief for Appellants/Brief for Cross-Appellees at 9; *Spagnola v. Mathis*, Memorandum Opinion, D.D.C. Civil Action No. 83–2448, March 30, 1984, at 10, JA 27 (hereinafter Mem.Op.). Inspection of the legislative history of the CSRA makes clear, however, that Congress intended to *increase* protection of federal employees who suffer reprisals for disclosing improper government conduct. Protection of "whistleblowers," as the District Court acknowledges, was central to Congress' plan. *See* Mem.Op. at 10, JA 27; S.Rep. No. 969, 95th Cong., 2d Sess. 8 (1978), *reprinted in* II Legislative History of the Civil Service Re-

form Act of 1978 (hereinafter Legislative History) at 1472 (whistleblowers are "conscientious civil servants [who] deserve statutory protection"). Congress meant to provide *additional* protection to such federal employees because it recognized that the existing administrative and judicial remedies had often proved inadequate. *See* S.Rep. No. 969, 95th Cong., 2d Sess. 2 (1978), *reprinted in* II Legislative History at 1466 (the Act "[p]rovides *new* protections for employees who disclose illegal or improper Government conduct") (emphasis added); 124 Cong.Rec. S14267 (daily ed. Aug. 24, 1978) (statement of Sen. Ribicoff), *reprinted in* II Legislative History at 1725 (same); 124 Cong.Rec. H8460 (daily ed. Aug. 11, 1978) (statement of Rep. Schroeder), *reprinted in* II Legislative History at 825 ("There is no effective means other than drawn out administrative and court proceedings for a whistleblower to set things right."). Congress clearly meant to encourage responsible whistleblowing by the creation of a new watchdog in the OSC and the MSPB. Moreover, Congress also feared that retaliation against whistleblowers would take forms more insidious than termination or demotion, envisioning precisely the sort of reprisal that Spagnola describes. *See* 124 Cong.Rec. S14280 (daily ed. Aug. 24, 1978) (statement of Sen. Sasser), *reprinted in* II Legislative History at 1632 (whistleblowers in the past have found themselves "transferred, or deprived of meaningful work"). It thus seems anomalous to attribute to Congress an intent to foreclose the pre-existing, judicially-created remedy of a *Bivens* action in those instances in which a tort action is a whistleblower's only effective avenue of relief from exactly those evils sought to be averted by the Act. We cannot attribute to Congress an intent to put whistleblowers in a *worse* position than they were in prior to the enactment of the CSRA.

ance Procedures (April 1982) (requiring neither examination of witnesses under oath nor a record transcript and providing for the decision, made by the same agency against whom the grievance is filed, to be completely discretionary

and unreviewable); *cf. McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) (holding arbitration procedures not sufficient to bar subsequent *Bivens* suit for damages).

The District Court, in denying Spagnola's *Bivens* claim, purported to avoid a different "anomaly." The court was concerned that "federal employees subjected to less serious personnel actions not rising to the level of an adverse action would have the right to pursue a damage action against their supervisors while federal employees subjected to more serious personnel actions such as removals or demotions would not." Mem.Op. at 10, JA 27. This argument assumes, however, that a *Bivens* action is preferable to the administrative scheme set up for employees subject to adverse actions under the CSRA. But, as Justice Marshall noted in his concurrence to *Bush* itself, "the procedure provided by the civil service scheme is in many respects *preferable* to the judicial procedure under a *Bivens* action." 462 U.S. at 391, 103 S.Ct. at 2418 (emphasis added). The employee is not required to overcome the qualified immunity of Executive officials as he would be in a damages action. *See Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). Suit under the CSRA's procedures is likely to be speedier and therefore less costly than a tort claim. *See* 124 Cong. Rec. H8460 (daily ed. Aug. 11, 1978) (statement of Rep. Schroeder), *reprinted in* II Legislative History at 825 (Reform Act meant to remedy pre-existing "drawn out" procedures); *see generally* 5 U.S.C. § 7701(i) (1982) (provisions meant to "assure expeditious consideration" of appeals to MSPB). Significantly, the burden of proof in an action before the MSPB is borne by the agency, rather than by the disciplined employee. 5 U.S.C. § 7701(c)(1) (1982). In addition, attorney fees may be awarded if the employee prevails under the Act. *Compare* 5 U.S.C. § 7701(g)(1) (1982) *with Bush,* 462 U.S. at 372 n. 9, 103 S.Ct. at 2408 n. 9 (expressly leaving open whether attorney fees may be recovered in a *Bivens* action). This package of streamlined procedures may well have been perceived by Congress as superior to those previously available to aggrieved federal employees. It thus seems plausible and not at all "anomalous" to attribute to Congress the intent both to supplant *Bivens* remedies when conceivably more favorable alternative remedies are available and to leave *Bivens* intact as a fall-back when they are not.

We also conclude that mere resort to the OSC is not a "constitutionally adequate" remedy for the First Amendment violations alleged by Spagnola. This finding of constitutional infirmity sheds light on what we may assume Congress intended in enacting the CSRA and supports our conclusion that Congress did not mean to eliminate Spagnola's *Bivens* action. The Supreme Court in *Bush* performed a similar analysis, finding both that Congress intended to preclude Bush's *Bivens* claim and that Congress' alternative remedies were "adequate" as a constitutional matter. *See* 462 U.S. at 368, 103 S.Ct. at 2406 (referring to Bush's remedies as "meaningful"); *id.* at 386, 103 S.Ct. at 2415 (same); *id.* at 378 n. 14, 103 S.Ct. at 2412 n. 14 (referring to Bush's remedies as "constitutionally adequate"); *id.* at 388, 103 S.Ct. at 2416 (expressly leaving open issue of availability of *Bivens* suits by employees whose claims "would otherwise go unredressed"). Moreover, the Court recognized that its discussions of congressional intent and adequacy were linked: the very comprehensiveness of the remedies afforded Bush not only demonstrated their adequacy but also bolstered the Court's determination that Congress meant those remedies to be exclusive. *See id.* at 388, 103 S.Ct. at 2416 (noting that Congress' "comprehensive" and "elaborate" remedial system should not be disturbed).

The *Bush* Court gave little guidance, however, as to what remedies are "adequate" other than those afforded Bush himself. This circuit has expressly considered the constitutional adequacy of the OSC remedy available to Spagnola and has clearly concluded that such a remedy is an inadequate vehicle for vindication of constitutional claims. Several other courts have reached the same conclusion, and those

that found otherwise have either not considered the adequacy of the OSC at all, or evaluated it under an erroneous standard. We thus do not hesitate to find that Spagnola's resort to the OSC is not an adequate remedy that precludes the availability of a *Bivens* suit for his First Amendment claims.

The first case in which this circuit considered the adequacy of resort to the OSC was *Borrell v. United States Int'l Communications Agency,* 682 F.2d 981 (D.C. Cir.1982). In *Borrell* a probationary employee of the ICA alleged that she was discharged in reprisal for whistleblowing. Because of her probationary status, Borrell was not covered by the adverse action procedure under 5 U.S.C. § 7701 (1982); thus, like Spagnola, Borrell had recourse only to a petition to the OSC. This court held that "the limited statutory remedy provided probationary employees, who have no appeal to the MSPB or to a judicial forum at all from an adverse personnel action or from an OSC decision not to prosecute, is not an adequate enough substitute for a prior judicial cause of action * * * ." 682 F.2d at 990. Our focus on the lack of judicial review of OSC decisions evinces a fear that the OSC, an administrative adjunct itself, whose decision determines whether an employee's claim will even get a hearing, lacks the independence necessary for such a conclusive determination regarding constitutional claims.[7] We reiterated our conclusion concerning the inadequacy of the OSC in *Cutts v. Fowler,* 692 F.2d 138 (D.C. Cir.1982), holding that the existence of internal grievance and OSC procedures "does not affect the jurisdiction of the district courts to hear constitutional claims based on personnel practices." *Id.* at 140. Although we decided these two cases before

the Supreme Court's decision in *Bush,* we made clear in *Borrell* that we were addressing a situation quite distinct from that presented in *Bush.* 682 F.2d at 990 ("We do not here presume to rule on the issue of whether the CSRA appeal procedures culminating in judicial review for tenured employees are the exclusive means of relief [the issue decided in *Bush* ]."). And the Court in *Bush* recognized that it was not precluding *Bivens* actions for *all* federal employees in disputes with their supervisors. *See* 462 U.S. at 388, 103 S.Ct. at 2416 ("The question is not what remedy the court should provide for a wrong that would otherwise go unredressed.").

Moreover, we have had ample opportunity since *Bush* to reconsider our opinions in *Borrell* and *Cutts,* and we have unequivocally sustained their validity. Our first post-*Bush* case, *Carducci v. Regan,* 714 F.2d 171 (D.C.Cir.1983), held that the OSC remedy did preclude other *statutory* remedies, but carefully distinguished without deciding the preclusion of *constitutional* remedies, citing both *Borrell* and *Cutts* with approval. *Id.* at 173–74. In *Williams v. IRS,* 745 F.2d 702 (D.C.Cir.1984), we refused to dismiss a First Amendment claim by an excepted service employee not covered by the procedures of the CSRA other than resort to the OSC. Reiterating our interpretation of *Bush* as foreclosing only those constitutional claims for which Congress afforded a "meaningful" statutory remedy, we found *Borrell* to be "the most instructive precedent" and expressly distinguished *Bush* because "Williams is differently situated [from Bush]; he has no CSRA-conferred guarantee of an administrative adjudication outside the Service or of direct court review." *Id.* at 705.[8]

---

**7.** Indeed, there seems reason to fear that the OSC is more susceptible to political currents than is appropriate for a body that is to constitute the sole forum for constitutional claims against the federal agencies. Representative Patricia Schroeder, the head of the Civil Service Subcommittee, introduced a bill, later withdrawn, to abolish the OSC, stating that it "now protects management and the administration from whistleblowers. It's the reverse [of Con-

gress' intent]." *Federal Times,* Aug. 23, 1982, *quoted in* Legislating Bureaucratic Change: The Civil Service Reform Act of 1978 at 48 (P. Ingraham & C. Ban eds. 1984).

**8.** We also relied in *Williams* on the fact that Williams was suing solely for equitable relief: "Nor does he use for damages as a substitute for or supplement to civil service remedies. He seeks only declaratory and injunctive relief." 745 F.2d at 705. Borrell, too, sought only eq-

*Williams* is our last word on the adequacy of the OSC remedy for constitutional claims. Subsequent cases have implicitly affirmed the validity of our holding in *Williams* by carefully distinguishing it. In *Krodel v. Young*, 748 F.2d 701 (D.C.Cir. 1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985), we noted that Krodel, who alleged retaliation in response to his exercise of First Amendment rights, was afforded a "meaningful" remedy for his constitutional claims because he could have obtained direct judicial review of an adverse agency ruling. We took care to note that "Krodel was thus in a different position than the appellants in *Borrell* and *Williams* who were governed by the CSRA. Those employees could not seek direct judicial review of a prohibited personnel practice not amounting to an adverse action; instead, their only statutory remedy was an essentially discretionary and unreviewable petition to the Office of the Special Counsel." *Id.* at 712 n. 6 (citations omitted). Similarly, in *Gray v. Office of Personnel Management*, 771 F.2d 1504 (D.C.Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1478, 89 L.Ed.2d 732 (1986), and *Barnhart v. Devine*, 771 F.2d 1515 (D.C. Cir.1985), we carefully distinguished the *Borrell* line of cases when we held the OSC remedy to be adequate for *non* constitutional claims. *See Gray*, 771 F.2d at 1511 n. 9 (*Borrell* and *Cutts* held that "the CSRA did not affect preexisting rights to judicial review of *constitutional*, as opposed to nonconstitutional, claims"); *Barnhart*, 771 F.2d at 1526 ("The *Borrell* court decided that, with respect to *constitutional* claims, the Special Counsel does not constitute an adequate alternative to a preexisting right of judicial review.").

The District Court recognized that "*Borrell* might control the instant case," Mem.Op. at 8, JA 25, but erroneously concluded that *Bush* required preclusion of Spagnola's *Bivens* claim, in essence determining that *Bush* overruled *Borrell* and its progeny.[9] This circuit's decisions subsequent to *Bush* make clear that we do not read *Bush* to cast doubt on the validity of *Borrell*, *Cutts*, and *Williams*. To the contrary, we have read *Bush*'s requirement of "meaningful" alternative remedies before foreclosure of constitutional remedies to support and require the results we have reached in our *Borrell* line of cases.

The dissent, apparently unwilling to hold that *Bush* overruled our circuit's precedent, concludes instead that none of our precedent controls and thus that "*Bush* is the only case that matters." Dissent at 38. In order to reach this remarkable conclusion, the dissent makes a valiant but extremely strained and wholly unsupported effort to distinguish all of our prior cases. The dissent first distinguishes *Borrell* and *Cutts* by claiming that these cases employed an "alternative remedy" analysis rather than the "special factors" analysis adopted by the *Bush* Court. *See* dissent at 38. Yet *nowhere* in either of these cases

---

uitable relief. Although in the instant case Spagnola *does* seek damages, he, like Williams, does not seek them as "a substitute for or supplement to" other available remedies. Spagnola has no other effective remedies, no forum in which to present his claims: the OSC has refused to prosecute, and Spagnola's claims for injunctive relief under the Constitution are moot because the appellants are no longer his supervisors. For Spagnola, as for Bivens himself, "it is damages or nothing." *Bivens*, 403 U.S. at 410, 91 S.Ct. at 2012 (Harlan, J., concurring).

Moreover, any attempt to distinguish Spagnola's case from *Williams* or *Borrell* on grounds that Spagnola seeks damages is impeded by this court's assumption in *Krodel v. Young*, 748 F.2d 701 (D.C.Cir.1984), a case in which the plaintiff sought damages, that both *Williams* and *Borrell*

were pertinent precedent. *Id.* at 712 n. 6 (distinguishing the remedy available to Krodel from the constitutionally inadequate OSC remedy available to Williams and Borrell).

9. The District Court also distinguished *Borrell* on grounds that "it is impossible to foresee the adequacy of the relief that plaintiff will ultimately receive from the OSC. * * * In contrast, *Borrell* was decided *after* the OSC had terminated its investigation with the finding that there was no evidence to substantiate the allegation of retaliation for whistleblowing." Mem.Op. at 8 & n. 3, JA 25. Since the District Court's decision, the OSC has informed Spagnola that it terminated its investigation and will not prosecute his complaint, putting him in exactly Borrell's situation.

does the court make reference to the "alternative remedy" language of *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). And, indeed, none of our post-*Bush* cases have read *Borrell* and *Cutts* in this light; on the contrary, all of them refer to *Borrell* and *Cutts* in the same breath as *Bush. See, e.g., Williams,* 745 F.2d at 705. Perhaps recognizing that its "alternative remedy" argument fails to distinguish our post-*Bush* cases, the dissent then maintains that *Borrell, Cutts,* and *Williams* all involved claims for equitable relief, whereas Spagnola seeks damages in the instant case. But to rely on this distinguishing feature the dissent must ignore our more recent decision in *Krodel,* a *damages* action in which we cited *Williams* and *Borrell* with approval. *See Krodel,* 748 F.2d at 712 n. 6. Moreover, the Ninth Circuit, in holding that the OSC is an inadequate remedy in light of *Bush,* found our decisions in *Williams* and *Borrell* directly on point. *See Kotarski v. Cooper,* 799 F.2d 1342, 1348–49 (9th Cir. 1986). Neither of the dissent's attempts to distinguish our prior cases can embrace all of them, and neither has found support from any other court. Our line of cases is simply too unequivocal in its clear rejection of the OSC as a remedy adequate to vindicate constitutional rights.

Both the District Court and appellants note that some other courts have heard claims like Spagnola's and rejected his contention that the OSC is an inadequate remedy for constitutional violations. *See* Mem.Op. at 10, JA 27; Reply Brief for Appellants/Brief for Cross-Appellees at 9. First, we respond that we are not alone in finding that the OSC is inadequate to foreclose resort to a *Bivens* suit. The Ninth Circuit recently considered precisely this issue and concluded that a probationary employee, who had exactly Spagnola's remedy of resort to the OSC, could maintain a *Bivens* suit because the OSC was not a constitutionally adequate statutory remedy. *See Kotarski,* 799 F.2d at 1348 ("We do not regard this structure [the OSC] as one that provides 'meaningful remedies' to one whose constitutional rights have been

violated."); *see also Egger v. Phillips,* 710 F.2d 292, 298 (7th Cir.) (*en banc*) (four judges would permit FBI agent excepted from the CSRA scheme to maintain a *Bivens* action because "the constitutional rights of federal employees in the workplace which are not protected by statute properly form the basis of a *Bivens* action"), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). Similarly, two district courts have held that statutory schemes which do not allow for judicial review of the agency determination are not adequate under *Bush. See Pope v. Bond,* 613 F.Supp. 708, 715 (D.D.C.1985) (relying on *Borrell* to hold that the OSC remedy cannot preclude a *Bivens* suit); *Nietert v. Kelley,* 582 F.Supp. 1536 (D.Colo.1984) (holding that remedies available to civilian Department of Defense employees are inadequate because judicial review is not available.). *See also Vest v. Department of the Interior,* 729 F.2d 1284, 1285–87 & n. 3 (10th Cir.1984) (barring *Bivens* suit by employee with access to review by the MSPB and the federal courts, but distinguishing hypothetical situation not covered by the federal scheme).

Second, we note that three of the four circuits that have concluded that the OSC remedy does preclude a *Bivens* action have done so without the analysis of the adequacy of alternative remedies that *Bush* seems to require. In *Hallock v. Moses,* 731 F.2d 754, 757 (11th Cir.1984), the court simply cited the Supreme Court's opinion in *Bush* with no discussion of the adequacy of the OSC procedures that constituted Hallock's sole remedy. *Braun v. United States,* 707 F.2d 922 (6th Cir.1983), and *Broadway v. Block,* 694 F.2d 979 (5th Cir.1982), were decided *before* the Supreme Court's *Bush* opinion. Neither case discussed the adequacy of the OSC procedures, and both relied on the Fifth Circuit's opinion in *Bush,* which based its holding on considerations different from those detailed in the Supreme Court's subsequent opinion. The Fifth Circuit found that "the unique relationship between the Federal Government and its civil service employees is a special

consideration which counsels hesitation in inferring a *Bivens* remedy in the absence of affirmative congressional action." *Bush v. Lucas*, 647 F.2d 573, 576 (5th Cir.1981). In contrast, the Supreme Court held that the CSRA's "comprehensive procedural and substantive provisions giving meaningful remedies against the United States" were the special factors counselling hesitation. *Bush*, 462 at 368, 103 S.Ct. at 2406. This circuit's post-*Bush* decision in *Reuber v. United States*, 750 F.2d 1039 (D.C.Cir. 1984), clearly rejects the Fifth Circuit's pre-*Bush* reasoning embraced in *Braun* and *Broadway*: "[T]he mere fact that this is an employment setting [does not] counsel judicial restraint." *Id.* at 1058. *See also id.* at 1065 (Bork, J., concurring) ("Though an employer's relations with his employees are indeed an area in which we should be slow to intrude, that consideration alone does not support denial of compensatory damages to a person aggrieved by the unconstitutional conduct of an employer * * * .").

Only one circuit that, subsequent to *Bush*, has found the OSC remedy to preclude a *Bivens* action has considered the adequacy of the OSC procedures. The Fourth Circuit in *Pinar v. Dole*, 747 F.2d 899 (4th Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985), addressed an employee's claim of retaliatory disciplinary action and concluded that "Pinar was afforded constitutionally adequate procedures [in the OSC] to protect his first amendment rights." *Id.* at 908. In reaching this conclusion, however, the court inappropriately applied the due process balancing test enunciated in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), *see Pinar*, 747 F.2d at 908, overlooking an important distinction between due process and First Amendment analysis. In the due process context courts look to see what kind of hearing if any is due before someone may be deprived of a liberty or property interest. They have concluded that when the threatened deprivation is relatively minor less elaborate and formal process is required. *See, e.g., Board of Regents v. Roth*, 408 U.S. 564, 570 n. 8, 92 S.Ct. 2701, 2705 n. 8, 33

L.Ed.2d 548 (1972); *Arnett v. Kennedy*, 416 U.S. 134, 164 n. 1, 94 S.Ct. 1633, 1649 n. 1, 40 L.Ed.2d 15 (1974). In the First Amendment context, however, there is no such sliding scale of protection for speech. Retaliation in response to protected speech violates an employee's First Amendment rights just as much when that retaliation is "minor" as it does when it is "major." Many courts have recognized this distinction, dismissing a due process claim because the plaintiff was given his procedural due, but simultaneously reaching the merits of a separate First Amendment claim. *See Williams v. IRS*, 745 F.2d 702, 704–05 (D.C.Cir.1984); *Murray v. Gardner*, 741 F.2d 434, 437, 440 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1050, 105 S.Ct. 1748, 84 L.Ed.2d 813 (1985); *Altman v. Hurst*, 734 F.2d 1240, 1242–43 (7th Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984); *Hughes v. Whitmer*, 714 F.2d 1407, 1417–18 (8th Cir.1983); *see also Brown v. Brienen*, 722 F.2d 360, 365 (7th Cir.1983) (rejecting due process claim in overtime dispute but acknowledging that a "public employer who harassed an employee in order to induce him to give up a substantive constitutional right, such as freedom of speech, would be violating" the First Amendment). The Fourth Circuit's analysis in *Pinar* therefore is significantly flawed.

In light of the clear precedent in this circuit establishing that the OSC is an inadequate remedy for vindication of constitutional rights and the unpersuasive reasoning of contrary decisions in other circuits, we must conclude that Spagnola's ability to petition the OSC does not preclude his commencing a *Bivens* suit under the First Amendment. The OSC's inadequacy is alone enough to require this conclusion, but it also sheds light on what Congress intended in establishing its statutory plan under the CSRA. Because we assume that Congress intended to stay within constitutional limits in constructing its remedial scheme, our finding that the OSC is an inadequate vehicle for vindication of constitutional rights supports our earlier conclusion

based on legislative history that Congress did not intend it to supplant pre-existing judicial remedies.

In addition to our *Borrell* line of cases, which clearly hold that the OSC is not an adequate remedy for constitutional violations, a distinct line of Supreme Court cases casts doubt on the adequacy of *any* administrative forum as the final arbiter of constitutional issues. In the seminal case of *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), the Supreme Court declared that "[i]n cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function." *Id.* at 60, 52 S.Ct. at 296. As Justice Brandeis put it, "[U]nder certain circumstances, the constitutional requirement of due process is a requirement of judicial process." *Id.* at 87, 52 S.Ct. at 306. (Brandeis, J., dissenting). Justice Brandeis later elaborated:

> The supremacy of law demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied; and whether the proceeding in which facts were adjudicated was conducted regularly. To that extent, the person asserting a right, whatever its source, should be entitled to the independent judgment of a court on the ultimate question of constitutionality.
> * * *

*St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 84, 56 S.Ct. 720, 740, 80 L.Ed. 1033 (1936) (Brandeis, J., concurring).

The Court applied these general principles in *Oestereich v. Selective Serv. Bd.*, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968). Justice Harlan, in agreeing with the majority that § 10(b)(3) of the Military Selective Service Act of 1967 did not preclude pre-induction judicial review on the facts of that case, noted that "[i]t is doubtful whether a person may be deprived of his personal liberty without the prior opportunity to be heard by some tribunal competent fully to adjudicate his claims." *Id.* at 243 n. 6, 89 S.Ct. at 419 n. 6 (Harlan, J., concurring). Similarly, in *Johnson v. Robison*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), the Court found 38 U.S.C. § 211(a), which denied judicial review of determinations of the Veterans' Administration, not to apply to that case, noting that a construction that would preclude courts from considering the constitutionality of veterans' benefits legislation would "raise serious questions concerning the constitutionality of § 211(a)." *Id.* at 366, 94 S.Ct. at 1165. Most recently, in *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the Court stated that "[c]onstitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions. * * * [W]e will not read a statutory scheme to take the 'extraordinary' step of foreclosing jurisdiction unless Congress' intent to do so is manifested by ' "clear and convincing" ' evidence." *Id.* at 109, 97 S.Ct. at 986 (*quoting Johnson*, 415 U.S. at 366–67, 94 S.Ct. at 1165–66).

None of the Supreme Court's cases have squarely determined whether Congress can deprive an individual of a judicial forum in which to raise constitutional claims and substitute an unreviewable administrative decision. The cases cited above suggest that constitutional litigants do have a right to an independent judicial hearing.[10] *See* Sager, *The Supreme Court, 1980 Term— Foreword: Constitutional Limitations on*

---

10. The dissent notes that if we found Spagnola's *Bivens* claim to be precluded, the consequent denial of any forum for his constitutional claim would be the work of a court responding to the perceived will of Congress rather than the enforcement of a direct congressional command. From this the dissent concludes that the constitutional concerns we raise here would not be implicated. *See* dissent at 39. Not so. The constitutional command at issue here is the requirement of *due process*. Spagnola's right to fundamental fairness in having some place to litigate his constitutional claim is no less abridged by a court than it would be by Congress; to hold otherwise would place the courts beyond the call of the Constitution. Thus the dissent cannot dismiss so lightly the constitutional concerns that we raise here.

*Congress' Authority to Regulate the Jurisdiction of the Federal Courts,* 95 HARV. L.REV. 17, 76 (1981) ("[T]he basic proposition [that such a right exists], though seldom threatened, and hence seldom tested, seems secure.") (*citing Crowell, St. Joseph Stock Yards Co.,* and *Johnson*); *see also* Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic,* 66 HARV.L.REV. 1362, 1383–84 (1953). In light of the Supreme Court's decisions in *Califano* and similar cases, this court has recently held that "[w]hen constitutional rights are at stake there is some question whether judicial review can be totally precluded. In any event, judicial review is precluded only when there is clear and convincing evidence of an intent to restrict access to the courts." *Cardenas v. Smith,* 733 F.2d 909, 918–19 (D.C.Cir.1984) (citations omitted). Thus we need not decide the difficult and unresolved constitutional issue as to whether judicial review can ever be totally precluded for constitutional claims. Because we have concluded more narrowly that Congress did *not* intend to preclude resort to the courts through a *Bivens* action, and that petition to the OSC *in particular* is not an adequate forum for constitutional claims, we need not resolve the broader constitutional quandary, though we feel compelled to recognize its existence.

### III. THE SECTION 1985(1) CLAIM

■ Whether Congress in enacting the CSRA may permissibly have foreclosed Spagnola's resort to a pre-existing *statutory* action is a question entirely distinct from the foreclosure of his constitutional claim. There is no requirement that Congress' alternative remedy be "adequate" or that Congress afford a certain kind of tribunal for claims that do not arise under the Constitution. Congress can create and modify nonconstitutional claims as it sees fit; the role of the courts is simply to divine congressional intent. Although we cannot find that Spagnola never had a cause of action under § 1985(1), we are satisfied that Congress meant the CSRA to be the exclusive statutory remedy for aggrieved federal employees and thereby foreclosed his resort to § 1985(1). We therefore reverse the District Court's holding that Spagnola's complaint stated a cause of action under § 1985(1).

We agree with the District Court that appellants' arguments regarding the scope of § 1985(1) are unpersuasive. Section 1985(1) provides:

> If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties; * * * the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(1), (3) (1982). Appellants argue that neither the language nor the legislative history of the section permit Spagnola to maintain a cause of action against his superiors. *See* Brief for Appellants at 8. We are satisfied, however, that appellants' transfer of Spagnola, their interference in his applications for promotion, their attempt to "get something on him" so that, presumably, he could be discharged, and their warnings to his co-workers—all measures taken in response to a report that Spagnola was asked to file as part of his job—can be construed as "injur[y] * * * on account of the lawful discharge of the duties of his office" or as attempts "to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States." As

the District Court noted, § 1985(1) is not a "narrow and limited remedy" but rather "a statute cast in general language of broad applicability ... and unlimited duration." Mem.Op. at 11, JA 28 (*quoting Stern v. United States Gypsum, Inc.,* 547 F.2d 1329 (7th Cir.), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977)). Indeed, the Supreme Court has urged us to give the Reconstruction Civil Rights Acts in general "a sweep as broad as [their] language," *Griffin v. Breckenridge,* 403 U.S. 88, 97, 91 S.Ct. 1790, 1796, 29 L.Ed.2d 338 (1971) (*quoting United States v. Price,* 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966)), and has described the sweep of § 1985 in particular as "enormous." 403 U.S. at 99–100, 91 S.Ct. at 1796–97.

Appellants further contend that even if Spagnola's claims might arguably fall within the language of § 1985, the section's legislative history restricts its applicability to the sorts of private violence that existed in the Reconstruction South in 1871 and thus excludes federal officials as defendants. *See* Brief for Appellants at 9. The dissent makes a similar argument based on language and legislative history to limit the scope of § 1985(1) to external disruption. *See* dissent at 32–36. In light of the Supreme Court's mandate in *Griffin* and significant case law in the lower federal courts, we cannot so limit the section. Citing *Griffin,* the District Court in *Stith v. Barnwell,* 447 F.Supp. 970, 973–74 (M.D.N.C.1978), stated unequivocally that "§ 1985(1) would apply where defendants who were acting as federal employees were participating in a conspiracy otherwise proscribed by the subsection." Similarly, in *Mollnow v. Carlton,* 716 F.2d 627, 631 (9th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 126 (1984), the Ninth Circuit noted that "§ 1985(1) *is* legislation specifically authorizing suit by injured fed-

eral officers [against their superiors]," but found that suit under the section was precluded for *military* subordinates. In *Windsor v. The Tennessean,* 719 F.2d 155 (6th Cir.1983), the Sixth Circuit held that the plaintiff stated a cause of action under § 1985(1) against a group of defendants, one of whom was his supervisor in the federal government. In *Lawrence v. Acree,* 665 F.2d 1319 (D.C.Cir.1981), this circuit assumed for purposes of deciding an official immunity claim that a § 1985(1) action would ordinarily lie against federal officials, though it did not rule on that issue. Finally, in *Perry v. Golub,* 400 F.Supp. 409 (N.D.Ala.1975), the District Court found that there was a substantial likelihood that the plaintiff would prevail on the merits of one of three claims, one of which was a § 1985(1) claim against his superiors in the federal government.[11]

There is also indirect support for a generous interpretation of § 1985(1) in the treatment of similar sections of the same Act. In interpreting a closely related section this circuit held that federal officials may be defendants under § 1985(3). *See Hobson v. Wilson,* 737 F.2d 1, 19–20 (D.C.Cir.1984). Moreover, the Supreme Court has given a broadly expansive reading to § 1983 of the Reconstruction Civil Rights Acts, rejecting arguments similar to those that appellants urge before us now. *See Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 481, 5 L.Ed.2d 492 (1961) ("Although the legislation was enacted because of the conditions that existed in the South at that time, it is cast in general language * * *.").

Although the District Court correctly ruled that Spagnola's cause of action was not precluded by the language or legislative history of § 1985(1), it did not discuss the impact of the CSRA on Spagnola's § 1985(1) claim. Appellants rely in part on

---

**11.** Appellants and the dissent rely on *Santistevan v. Loveridge,* 732 F.2d 116 (10th Cir.1984), which held a § 1985(1) action "does not apply when the defendants are acting under color of federal law." *Id.* at 118. The court's opinion in *Santistevan,* however, relied in part on its finding that "[a] viable § 1985(1) cause of action

requires allegations of class-based or racial discriminatory animus." *Id.* This requirement had been clearly rejected by the Supreme Court the previous year in *Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983), and thus *Santistevan* is of dubious persuasive value.

the Supreme Court's opinion in *Bush* to support the proposition that the CSRA forecloses Spagnola's § 1985(1) claim. *See* Brief for Appellants at 13–14. *Bush*, however, dealt only with the effect of the CSRA on the judicial implication of *constitutional* remedies, not with the foreclosure of statutory claims, and thus appellants' reliance is misplaced. Nevertheless, a number of cases in this circuit, quite distinct from *Bush* and its progeny, do establish that the CSRA is the exclusive remedy for aggrieved federal employees advancing nonconstitutional claims.

In *Carducci v. Regan*, 714 F.2d 171 (D.C. Cir.1983), this court ruled that the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (1982), were pre-empted by the enactment of the CSRA. The court thus found that the CSRA provided the plaintiff's exclusive remedy in that case because "the exhaustive remedial scheme of the CSRA would be impermissibly frustrated by permitting, for lesser personnel actions not involving constitutional claims, an access to the courts more immediate and direct than the statute provides with regard to major adverse actions." *Id.* at 174. Last year, in *Gray v. Office of Personnel Management*, 771 F.2d 1504 (D.C.Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1478, 89 L.Ed.2d 732 (1986), we affirmed the District Court's holding that it lacked jurisdiction over the plaintiffs' suit for damages, injunctive relief, and mandamus against their employing agency because they had an adequate alternative remedy in a petition to the OSC under the CSRA. Similarly, in *Barnhart v. Devine*, 771 F.2d 1515 (D.C.Cir.1985), we affirmed the dismissal of the plaintiffs' mandamus petition against their employing agency because they had an alternative avenue of relief in a petition to the OSC under the CSRA. These cases seem to be applications of the general principle set out by the Supreme Court in *Brown v. GSA*, 425 U.S. 820, 834, 96 S.Ct. 1961, 1968, 48 L.Ed.2d 402 (1976), that "a precisely drawn, detailed statute preempts more general remedies." Although none of the above cases deals with § 1985(1) in particular,

their unifying thread seems to be that the CSRA precludes resort to other statutory schemes for aggrieved federal employees raising nonconstitutional claims against their employers. We thus conclude that Spagnola's § 1985(1) claim is likewise precluded.

## IV. APPELLANTS' OFFICIAL IMMUNITY DEFENSE

Appellants argue alternatively that even if this court affirms the District Court's holding that Spagnola may assert a claim under § 1985(1), we should dismiss his claim as barred because appellants are immune from suit. Although we reverse the District Court's holding as to § 1985(1), we nonetheless address appellants' immunity argument because we find the District Court's disposal of it equally applicable to the *Bivens* claim.

Appellants' claim of immunity is based on the doctrine developed in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), in which the Supreme Court held that federal officials exercising discretionary authority are entitled to qualified immunity from suit. The Court balanced the need to protect federal officials from the burden of defending frivolous suits against the need for a damages remedy to deter unlawful conduct. It concluded that federal officials would be granted immunity only if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 817–18, 102 S.Ct. at 2737–38. The Court noted that such a determination should rest on objective factors and should be measured with reference to existing law at the time the action occurred. *Id.* The Court affirmed its holding in *Harlow* last Term in *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), emphasizing that the availability of an immunity defense turns on the plaintiff's allegations in his complaint. 472 U.S. at 526, 105 S.Ct. at 2816. The Court further stated that "the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to cre-

ate a genuine issue as to whether the defendant in fact committed those acts." *Id.*

■ The District Court applied the immunity doctrine to the facts of this case and rejected appellants' motion for summary judgment based on their claim of official immunity. Clearly, Spagnola's affidavits create a genuine issue as to whether appellants in fact committed the acts alleged. The District Court found, in addition, that the rights alleged to be violated were "clearly established" such that a reasonable person would have known of their existence. Because the District Court dismissed Spagnola's *Bivens* claim and upheld his § 1985(1) cause of action, the "rights" it discussed were Spagnola's rights under § 1985(1). We have reversed the District Court's holding as to both the *Bivens* and the § 1985(1) issues, but we find the court's discussion of appellants' immunity argument equally if not more persuasive for Spagnola's *Bivens* claim as it was for his § 1985(1) claim. Thus we affirm the District Court's immunity holding and its denial of summary judgment to appellants.

On appeal appellants attack the District Court's opinion on two grounds. First, they argue, the court confused the standards for evaluating their motion to dismiss the complaint with the standards for evaluating their claim for immunity, collapsing the two standards into a single step. We do not read the court's opinion to support this characterization. The opinion noted that "the Court must consider 'only whether the right that [plaintiff] *alleged* to have been violated was well-established at the time the *alleged* acts occurred.'" *Spagnola v. Mathis,* Memorandum Order, D.D.C. Civil Action No. 83–2448, July 3, 1985, at 2, JA 33 (*quoting Hobson v. Wilson,* 737 F.2d 1, 27 (D.C.Cir.1984)). This correct statement of the applicable legal standard demonstrates that the District Court did not err in construing the law.

Second, appellants contend that the rights alleged by Spagnola to be violated were not clearly established. In their briefs appellants focused only on the § 1985(1) claim. These arguments are in-

applicable now in that we have held that the claim may not be maintained. But analogous arguments in the First Amendment *Bivens* context are equally invalid. Appellants contend that because it is at least arguable that the CSRA precluded Spagnola's § 1985(1) claim, his rights under that statute are not "clearly established." *See* Supplemental Brief for Appellants/Cross-Appellees at 6. Presumably, they would advance a similar argument in the constitutional context: because it is a controversial matter whether a federal employee's *Bivens* action is precluded by the OSC procedures under the CSRA, that employee's right is also not "clearly established." The District Court properly rejected this argument in the § 1985(1) context, and we extend its reasoning to the *Bivens* context. The mere fact that the procedures by which a right is to be vindicated are not "clearly established" does not mean that the right itself is not clear. Confusion over a claimant's proper *remedy* implies nothing about the nature of the claimant's *right.* Spagnola's right not to be harassed in retaliation for whistleblowing is unambiguously clear from the CSRA, 5 U.S.C. § 2302(b)(8) (1982) ("Any employee who has authority to * * * direct others * * * shall not * * * take or fail to take a personnel action with respect to any employee or applicant for employment as a reprisal for a disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety[.]"), and from the First Amendment itself. Appellants cannot plausibly suggest that a reasonable person would not find these rights to be "clearly established." As the District Court held: "A reasonable person in defendants' circumstances would or should have known of the patent illegality of such conduct. Defendants should not be allowed to defuse serious allegations such as this merely by asserting the doctrine of official immunity." Memorandum Order at 4, JA 35.

## V. CONCLUSION

For the reasons stated above, we reverse the District Court's dismissal of appellee's First Amendment *Bivens* claim. We also reverse the court's holding that appellee may maintain a cause of action under § 1985(1). We affirm the court's denial of appellants' motion for summary judgment based on their groundless claim of official immunity.

*Affirmed in part and reversed in part.*

SILBERMAN, Circuit Judge, concurring in part and dissenting in part:

Although I concur in the majority's view that Spagnola is precluded from maintaining a section 1985(1) suit, I disagree with the majority's analysis of that issue. I also disagree with the majority's decision to grant Spagnola a *Bivens* remedy against his supervisors, and therefore dissent from Part II of the majority opinion. As these conclusions would dispose of Spagnola's lawsuit, I do not reach the official immunity issue discussed in Part IV.

The disputes before us today, both in this case and in *Hubbard v. EPA, et al.*, 809 F.2d 1, represent additional links in a lengthening chain of cases in which federal employees have sought to challenge supervisory actions and recover damages from their superiors under various theories of liability. Each of these decisions has in large part turned on the questions: (1) whether the claims advanced have ever been available in the context of federal employment, and (2) insofar as these claims were previously available in such a context, to what extent the Civil Service Reform Act of 1978 has eclipsed them.

This case concerns the availability and scope of claims under a provision of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(1) (1982), and under the *Bivens*[1] doctrine. For the reasons set forth below, I would affirm the district court's holding regarding Spagnola's first amendment *Bivens*

claim and reverse the holding regarding the section 1985(1) claim. This disposition would render it unnecessary to review the district court's treatment of the defense of qualified immunity.

### I.

The district court certified to us the question of "the availability of 42 U.S.C. § 1985(1) to [Spagnola], a Federal civil service employee, to state a claim for money damages and a jury trial against defendants, his former supervisors, in the context of [his] federal employment." J.A. at 44. This is a case of first impression in this Circuit. Although I agree with the majority that, in the end, section 1985(1) provides no cause of action to Spagnola against his supervisors, I take a different path to reach that conclusion.

Interpreting the provision we must, of course, begin with its language. Sections 1985(1) and (3) provide:

(1) If two or more persons in any State or Territory conspire to prevent, by force, intimidation or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any *duties* thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his *duties as an officer* are required to be performed, or to injure him in his person or property on account of his lawful discharge of the *duties of his office* or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his *official duties;*

. . . .

(3) . . . in any case of conspiracy set forth in this section [1985], if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of the conspiracy, whereby another is injured in his person or proper-

1. *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

ty, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. §§ 1985(1), (3) (1982) (emphasis added).

Quite evidently, then, even where the alleged injury for purposes of section 1985(3) is unambiguous,[2] the object of the conspiracy for purposes of section 1985(1) must be obstruction of, or retaliation for, the lawful discharge of the *duties* of the plaintiff's office (except where the complaint alleges a conspiracy to prevent the plaintiff from even accepting or holding federal office). Indispensable to the cause of action, therefore, is an available definition or determination of those duties.

If a federal officer sues persons outside the federal service under this statute, normally the scope of his duties would not be in issue; and even if it were—if, for example, a defense could be based on a claim of ultra vires or unlawful action on the officer's part—one would look to the Govern-

ment (*i.e.*, his supervisors) for an authoritative description of the plaintiff's duties. To recognize a suit by a federal officer under section 1985(1) against his supervisors for interference with his official duties would create an anomaly under the statutory language: supervisors by their very direction of subordinates, both general and specific, define the scope of their subordinates' duties.[3] Indeed, in 1871—over a decade before the creation of the civil service, and long before the advent of such modern personnel innovations as the "position descriptions" on which appellee would have us rely[4]—normally the *only* definitions of a federal officer's duties would come from his supervisor's direction. How then, it may be asked, could Congress possibly have intended section 1985(1) to be used as appellee suggests here?

Surely the Reconstruction Congress could not have wished the federal courts, in the context of a damage action, to referee disputes between federal supervisors and their subordinates as to the appropriate scope of the latter's duties. Even today (let alone in 1871) that would be seen as striking deep into the capacity of the Executive Branch to perform its functions.[5]

**2.** I would not reach the question whether Spagnola could, on the facts he alleges, have been "injured in his person or property" or "deprived of having and exercising any right or privilege of a citizen of the United States." *See Collins v. Hardyman*, 341 U.S. 651, 660, 71 S.Ct. 937, 941, 95 L.Ed. 1253 (1951).

**3.** The district court, while ultimately holding that Spagnola could state a section 1985(1) claim, was evidently troubled by this aspect of applying section 1985(1) between federal officers:

Mr. Chuzi [Appellee's counsel]: He was taken out of a position of authority, and reassigned to a position of lesser authority. He was removed—
The Court: Any diminution in pay?
Mr. Chuzi: No, Your Honor ... but, essentially, that reassignment ended. His authority to act in that position. [sic] He was sent out to this ... Federal Acquisition Research Project, where he was writing these regulations and kept there for 18 months....
The Court: I understood you to say that writing regulations is one of [Spagnola's] responsibilities.
Mr. Chuzi: It was one of his responsibilities.

The Court: And he was transferred to a place where that was his prime duty?
Mr. Chuzi: That was his prime duty but the problem is that he was taken out of his own office not at his request and assigned some place else....

. . . . .

The Court: What was the office charged with doing to which he was transferred? You said writing regulations. That is his prime function, isn't it?
Mr. Chuzi: That was one of his functions, Your Honor. Was responsible [sic] for writing regulations, implementing those regulations and overseeing the manner in which contracts were let by the FAI. That was his job, yes. They transferred him out of FAI where he could no longer perform the latter parts of his duties and they transferred him to a job where he would be required to draft regulations.
J.A. at 64, 74–75.

**4.** *See* the colloquy between appellee's counsel and the district court, J.A. at 74.

**5.** *Cf. Myers v. United States,* 272 U.S. 52, 135, 47 S.Ct. 21, 31, 71 L.Ed. 160 (1926).

Nothing in the Civil Service Reform Act, nor in any other statute of which I am aware, authorizes the federal courts to determine the "appropriate" official duties of a federal officer. That determination has always been regarded as within the Executive's managerial discretion.[6]

The appellee would have us conclude that the Forty-Second Congress desired the federal judiciary to play a role in defining Executive Branch officers' duties far more intrusive than that which Congress directed over a hundred years later. *See supra* note 6. I find the argument far-fetched but nonetheless turn to the origins of the statute to determine whether it provides support for plaintiff's interpretation.

The language of section 1985(1) was taken from a Civil War enactment, the Act of July 31, 1861, ch. 33, 12 Stat. 284 (1861), now codified as amended at 42 U.S.C. § 1985(1) (1982).[7] The wartime wording was incorporated by the Forty-Second Congress as part of the Act of April 20, 1871, which became popularly known as the Ku Klux Klan Act. This enactment was one of the last of the so-called Force Acts designed to effectuate the Reconstruction Amendments and secure federal authority in a South still under military occupation. It was prompted by President Grant's report to Congress that a "condition of affairs now exists in some States of the Union rendering life and property insecure and the carrying of the mails and the collection of the revenue dangerous," Cong. Globe, 42d Cong., 1st Sess. 244 (1871), and by an alarming 600–page report on the Klan by a Joint Select Committee of Congress. S.Rep. No. 41, 42d Cong., 1st Sess. pts. 1–13 (1871). *See Collins v. Hardyman,* 341 U.S. at 656–58, 71 S.Ct. at 939–40; *McCord v. Bailey,* 636 F.2d 606, 615 (D.C.Cir.1980), *cert. denied,* 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 839 (1981).

Although the 1871 Act was a comprehensive remedial measure serving a variety of purposes, the greater part of the Act "relate[s] to the preservation of the institutions and processes of the Federal Government," *Kush v. Rutledge,* 460 U.S. 719, 724–25, 103 S.Ct. 1483, 1487, 75 L.Ed.2d 413 (1983). The nature of these provisions reveals an overarching congressional concern to protect the authority, institutions and processes of the Federal Government from *external,* usually coercive, disruption. Section 2 of the Act applied, *inter alia,* to conspiracies to overthrow or levy war against the United States or hinder the execution of its laws; conspiracies by force or threat to deter or punish parties, witnesses or jurors in federal courts; conspiracies by force or threat to prevent any legally-qualified U.S. citizen from participating in federal elections; and the conspiracies now detailed without material change in the provision at issue in this case, section 1985(1). Further sections of the 1871 Act authorized the President actually to use troops to suppress civil disorder and to suspend the writ of habeas corpus.

The structure and origins of section 1985(1) reveal a grave congressional concern to protect the authority and institutions of the Federal Government from *outside* interference. The provision's origin as a war measure, its re-enactment under conditions deemed by Congress to be virtually insurrectional, and the harsh penal and military character of the remainder of the statute persuade me that this singularly powerful instrument was intended by Congress as a shield to protect federal officials from external coercion in a hostile environment, not a tool for resolving personnel disputes *between* members of the federal service.

---

**6.** Although a change in an officer's duties could be relevant to certain claims ultimately reviewable in the federal courts, 5 U.S.C. § 2302(a)(2)(A)(x) (1982), the change would be relevant only to determine whether an employee suffered an improperly motivated action, *Carducci v. Regan,* 714 F.2d 171, 174 n. 3 (D.C.

Cir.1983)—not because the official has, in the sense Spagnola suggests, a statutory right to a job with certain prescribed and defined duties.

**7.** Section 1985(1) as originally enacted subjected conspirators to both civil and penal liability. The 1861 Act imposes only penal liability.

The majority nevertheless adopts Spagnola's argument that the Supreme Court, in interpreting other civil rights statutes of the Reconstruction era, has generally " 'accord[ed] [them] a sweep as broad as [their] language.' " *Griffin v. Breckenridge*, 403 U.S. 88, 97, 91 S.Ct. 1790, 1796, 29 L.Ed.2d 338 (1971) (quoting *United States v. Price*, 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966)). But, as I have already indicated, appellee urges a strained interpretation of the actual language in section 1985(1). In any event, the Supreme Court has "repeatedly warned against the dangers of an approach to statutory construction which confines itself to the bare words of a statute, for 'literalness may strangle meaning.' " *Lynch v. Overholser*, 369 U.S. 705, 710, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962) (Harlan, J.) (quoting *Utah Junk Co. v. Porter*, 328 U.S. 39, 44, 66 S.Ct. 889, 892, 90 L.Ed. 1071 (1946)) (other citations omitted). In *Griffin v. Breckenridge* itself, the Court held that Congress intended another subsection of the statute, section 1985(3), to reach only conspiracies motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus," although the language of the subsection is more general. 403 U.S. at 101–102, 91 S.Ct. at 1797–98.

Congressional enactments in the civil service field from the Pendleton Act of 1883 to the Civil Service Reform Act of 1978 ("CSRA") support this reading of the earlier statute. If section 1985(1) applies to disputes between federal officers, it must perforce apply without regard to the extent of remedies made available by Congress in *later* civil service enactments. Therefore, it would be impossible to hold that section 1985(1) applied *only* to those complaints by subordinates against their superiors not "adequately" remedied by CSRA.[8] Although I find no discussion of section

1985(1) claims in the legislative history of the CSRA,[9] I conclude that Congress could not have intended such overlapping coverage of civil service disputes. The Supreme Court has "in a variety of contexts ... held that a precisely drawn, detailed statute pre-empts more general remedies." *Brown v. General Services Administration*, 425 U.S. 820, 832, 96 S.Ct. 1961, 1967, 48 L.Ed.2d 402 (1976). *See also Middlesex County Sewerage Auth'y v. National Sea Clammers Ass'n*, 453 U.S. 1, 19–21, 101 S.Ct. 2615, 2625–27, 69 L.Ed.2d 435 (1981).

Here, too, I find no specific manifestations of congressional intent in enacting the civil service statutes to pre-empt the earlier provision. Here, too, however, elaborate legislative schemes like the CSRA could, under the appellee's interpretation, be displaced "by perverse application of Gresham's law ... were immediate access to the courts under other, less demanding statutes permissible." *Brown*, 425 U.S. at 833, 96 S.Ct. at 1968. As in *Brown*, "[i]t would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading." *Id.* I cannot infer a Congressional intent to produce such anomalous results. *See Lawrence v. Acree*, 665 F.2d 1319, 1328 (D.C. Cir.1981) (Wald, J., concurring) ("It would be inconsistent with the carefully crafted Congressional scheme in this area to imply a new cause of action under an old statute...."); *Mollnow v. Carlton*, 716 F.2d 627, 631–32 (9th Cir.1983) (military subordinates may not sue superiors under section 1985(1) because court infers from unique character of the military that "[Congress] obviously did not intend to supplement ... internal military [review] procedures through enactment of § 1985(1)"),

---

8. To accept the appellee's view that both the CSRA and section 1985(1) govern the civil service would make a mockery of the Supreme Court's holding in *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). We would have to infer that the same evils ascribed by the *Bush* Court to allowing *Bivens* claims to co-exist with CSRA remedies were sanctioned by

the Congress which enacted the CSRA in 1978. *See infra* at pp. 39–40.

9. Congress was careful to enumerate those preexisting statutory remedies which it intended to survive the enactment of the CSRA. 5 U.S.C. § 2302(d) (1982).

*cert. denied,* 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 126 (1984).

The other courts of appeals that have considered the statute have reached similar conclusions as to its scope. *See, e.g., Santistevan v. Loveridge,* 732 F.2d 116, 118 (10th Cir.1984) (legislative history of section 1985(1) "clearly indicates that the Act was not enacted to develop a forum within the federal courts whereby dissatisfied federal employees could resolve internal personnel problems"); *Windsor v. The Tennessean,* 726 F.2d 277 (6th Cir.) (dictum), *denying petition for rehearing in* 719 F.2d 155 (6th Cir.1983), *cert. denied,* 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984); *Mollnow v. Carlton,* 716 F.2d at 631 (military subordinate may not sue superior under section 1985(1)).[10]

The majority's reliance upon *Stern v. United States Gypsum, Inc.,* 547 F.2d 1329 (7th Cir.), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977), is misplaced. The court in *Stern* stated that an IRS agent was not barred from stating a claim under section 1985(1) against corporate officers who allegedly conspired to defame him to his superiors in order to disrupt his audit of their company. This is a clear instance of the sort of external interference with government officers that section 1985(1) was designed to prevent. I agree with the *Stern* court that "Congress, in enacting what became § 1985(1), did not fashion a narrow and limited remedy applicable only to the southern states in 1871," and that it is not dispositive that "the immediate attention of the Forty-Second Congress was focused on circumstances which bear little resemblance to the facts alleged in [the] complaint." *Id.* at 1335. *See also*

*Lawrence v. Acree,* 665 F.2d at 1328 (Wald, J., concurring) ("[Section] 1985(1) should not be so restricted that it applies only in those precise situations contemplated in 1871 by its framers."). Undoubtedly, section 1985(1) is applicable to external interference with federal officers coming within its terms, whether or not "any member of [the Forty-Second] Congress ever specifically contemplated the application of the provisions which became § 1985(1)" to the precise form that interference takes. *Stern,* 547 F.2d at 1335. This survey of the origins of section 1985(1) is for the purpose of determining the evil at which it was directed, not the specific manifestations of that evil that were before the framers' minds at the time. I would simply hold that the evil Congress addressed in enacting section 1985(1) is interference with federal officers by persons outside the Federal Government, and not the very different abuses that arise in the internal operation of the federal bureaucracy, and which Congress has independently regulated through comprehensive statutory enactments. *See Lawrence v. Acree,* 665 F.2d at 1328.[11]

### II.

In his cross-appeal, Spagnola seeks a reversal of the district court's dismissal of his claim for monetary and injunctive relief against the appellants, grounded on their alleged violations of his rights under the first amendment. The majority holds, and I agree, that because appellants no longer supervise him, Spagnola's claim for injunctive relief against them in their individual capacities is moot. But as to the majority's decision to allow his *Bivens* claim, I must part company.

---

**10.** *But see Stith v. Barnwell,* 447 F.Supp. 970 (M.D.N.C.1978) (dictum); *Perry v. Golub,* 400 F.Supp. 409 (N.D.Ala.1975) (granting TRO against federal employee's supervisor, without discussion of section 1985(1)'s applicability in federal employment context, on grounds that there was substantial likelihood employee would prevail on either section 1985(1) ground or on two others).

**11.** The appellee also argues that Congress could not have intended to immunize from section

1985(1) liability federal officials who, in league with those outside the service who were conspiring against federal authority, threatened or injured subordinates. It is not necessary to decide today whether section 1985(1) could support such a claim where there is no question concerning the scope of duties of the subordinates and where the conspiracy was related to the core concerns of Congress when it passed section 1985(1).

Another case decided today, *Hubbard v. EPA, et al.*, 809 F.2d 1, addresses this same issue: whether, in light of Congress' enactment of the Civil Service Reform Act ("CSRA"), a *Bivens* remedy should be made available to persons who suffer adverse federal personnel decisions. My reasons for answering this question in the negative are set forth in the majority opinion in that case, and apply with equal weight here. However, the majority's discussion of this issue compels me to offer some additional thoughts.

The majority's analysis of the controlling case, *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), begins correctly enough by observing that *Bivens* actions are precluded in two situations: when Congress explicitly declares an equally effective remedy to be a substitute for a *Bivens* remedy, and when "special factors" exist that counsel courts to hesitate before authorizing a new kind of federal litigation. The majority goes on to say that because Congress did not explicitly preclude *Bivens* claims in enacting CSRA, the so-called "alternative remedy" test is not applicable here; the availability of a *Bivens* remedy in this case turns on whether special factors exist that counsel us not to create a *Bivens* remedy.

That said, however, the majority proceeds to ignore the important special factors that virtually dictate judicial restraint here, and to instead base its holding on the same "alternative remedy" analysis that it already conceded was irrelevant to the case. The majority begins this analysis by, in my view, misinterpreting *Bush v. Lucas*. Properly read, *Bush* holds that

because the CSRA remedial system *in its entirety* is a "comprehensive procedural and substantive provision[ ] giving meaningful remedies ... it would be inappropriate for [courts] to supplement that regulatory scheme with a new judicial remedy." *Bush*, 462 U.S. at 368, 103 S.Ct. at 2406. Yet the majority fixes upon the *Bush* Court's occasional use of the terms "meaningful remedies" and "constitutionally adequate remedies" to justify a close examination of the efficacy of the specific CSRA remedies offered to Spagnola, and accordingly rejects as inadequate Spagnola's appeal to the Office of Special Counsel ("OSC").[12]

The *Bush* Court's refusal to recognize a *Bivens* remedy did not rest on a finding that the specific CSRA remedies offered the plaintiff in that case were "meaningful" or even "constitutional." Indeed, the Court began its analysis by observing, and dismissing as irrelevant, the fact that "civil service remedies were not as effective as an individual damages remedy and did not fully compensate [the plaintiff] for the harm he suffered." *Bush*, 462 U.S. at 372, 103 S.Ct. at 2408 (footnote omitted). Nor was the Court moved by the plaintiff's argument that "civil service remedies against the Government do not provide for punitive damages or a jury trial and do not adequately deter the unconstitutional exercise of authority by supervisors." *Id.* at 372 n. 8, 103 S.Ct. at 2408 n. 8. The Court's refusal to create a new *Bivens* remedy rested not on the meaningfulness of the CSRA remedies available to Bush, but instead on the notion of judicial restraint. The Court felt it was not its job to

---

12. The term "meaningful remedies" appears in the Supreme Court opinion twice. *Bush*, 462 U.S. at 368, 386, 103 S.Ct. at 2406, 2415. In both cases, the context in which the term is used appears to suggest that the Court meant to describe as "meaningful" the entire set of remedies provided by the comprehensive CSRA system.

The term "constitutionally adequate [remedies]" appears in a footnote to the opinion. *Id.* at 378 n. 14, 103 S.Ct. at 2412 n. 14. Although there the Court found Bush's specific civil service remedy "clearly constitutionally adequate," it reserved the question whether the Constitution requires a *Bivens* remedy in the absence of *any other* remedy to vindicate an underlying

right. Spagnola had a remedy, so we are not even faced with the question the Supreme Court reserved.

The majority in effect adopts Justice Marshall's concurring opinion which, if it were governing law, would require courts to determine, before deferring to CSRA, that the plaintiff has a remedy under that statute which is "substantially as effective as a damages action." *Bush*, 462 U.S. at 390, 103 S.Ct. at 2418 (Marshall, J., concurring). Had the full Court meant to impose a remedy-specific inquiry upon the federal courts, it would have said so; Justice Marshall's separate concurrence would then not have been necessary.

pass judgment on the adequacy of various remedies offered by CSRA. Instead, it believed the task of resolving the conflicting policy considerations involved in the "federal employee rights versus litigation costs" debate belongs exclusively to Congress:

The question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed [by Congress] step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violations at issue. That question obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff.

. . . .

... In all events, Congress is in a far better position than a court to evaluate the impact of a new species of litigation between federal employees on the efficiency of the civil service....

*Id.* at 388–89, 103 S.Ct. at 2416–17. *Bush v. Lucas* does not permit this court to measure the various remedies available to federal employees against some self-defined yardstick of "meaningfulness."

An analysis of Circuit precedent shows that this court has remained faithful to the holding of *Bush v. Lucas.* Before *Bush* applied the "special factor" test to civil service disputes, our analysis of such cases was controlled by the "alternative remedies" test of *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). Under that test, we had a clear obligation to examine the remedy offered by the government as an alternative to the *Bivens* remedy to see if it was equally as effective as the constitutional remedy. In *Borrell v. U.S. International Communications Agency,* 682 F.2d 981 (D.C.Cir.1982), we responded to the government's claim that CSRA preempted *Bivens* claims by applying the *Carlson* alternative remedy test to determine whether "Congress meant [by enacting CSRA] to take away from probationary employees preexisting rights of action to pursue constitutional rights in district court actions." *Id.* at 989. Under this

test, we concluded, first, that Congress was not sufficiently explicit about its alleged intent to displace judicially-created remedies for constitutional violations, *id.,* and second, that the proffered CSRA remedy was not adequate to serve as a substitute for constitutional remedies, *id.* at 990. In *Cutts v. Fowler,* 692 F.2d 138 (D.C.Cir. 1982), we performed a similar analysis under the "alternative remedies" test, with a similar result. *Id.* at 140.

As the majority recognizes, *Bush* changed the analysis of this issue when it turned away from the alternative remedies test and instead gave substance to the special factors test. Yet until today, this court has not squarely considered whether the special factors test counsels us to deny a constitutional damages claim to remedy an alleged prohibited personnel practice. Although the majority attempts to analogize from other civil service cases considering different issues, in the end, *Bush* is the only case that matters.

In the immediate aftermath of *Bush,* we held in *Carducci v. Regan,* 714 F.2d 171 (D.C.Cir.1983), that the CSRA remedial scheme precludes other *statutory* remedies, but (as the majority notes) did not decide whether it is a special factor that counsels us to avoid creating other *constitutional* remedies. In *Bartel v. F.A.A.,* 725 F.2d 1403 (D.C.Cir.1984), we observed that under the special factors test, CSRA preempts civil servants' *Bivens* claims based on conduct remediable under CSRA, and remanded to the district court so it could decide whether the alleged violations were remediable under CSRA. *Id.* at 1415. *Bartel* left open the issue we address today. In *Williams v. IRS,* 745 F.2d 702 (D.C.Cir.1984), a case where the plaintiff-employee sought equitable relief only, we applied *Borrell* (which also involved only equitable relief) and recognized the plaintiff's right to seek equitable relief in federal courts. *Williams* merited a different analysis than the one required in the instant case because the courts' power to impose equitable remedies against agencies is broader than its power to impose legal remedies against individuals. In *Krodel v. Young,* 748 F.2d 701 (D.C.Cir.1984), *cert.*

*denied,* —— U.S. ——, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985), we described the CSRA remedial system as "a comprehensive statutory forum" that, under *Bush,* precludes a *Bivens* claim. The majority makes much of dicta contained in a footnote that implied that a statutory right to petition the OSC, without more, would not preclude a *Bivens* claim for damages. But as that observation was not necessary to the resolution of the case, it should not be used to support a deviation from otherwise consistent precedent.

The conclusion I draw from this review of Circuit precedent is that while scrutiny of specific CSRA remedies was certainly proper before *Bush* was decided, and may still be proper when we consider extending equitable remedies for constitutional violations, such scrutiny is no longer proper when considering whether to extend a *Bivens* remedy to the subjects of adverse federal employment decisions.[13]

Having disagreed with the majority's view that a constitutional analysis of Spagnola's remedy is necessary, I must also disagree with the assumption that guides that analysis. The majority analyzes the case as if Congress had specifically sought to bar the judiciary from employing a constitutionally required remedy—an *Ex Parte McCardle*-type situation.[14] But that is not the case with which we are presented. Instead, the question is: can and should the Federal judiciary—led by the Supreme Court—as a matter of *policy*[15] decline to extend a *Bivens* remedy to federal employees in light of congressional adoption of a comprehensive scheme that governs federal personnel practices. We ask not what Congress may do, but what courts may do; surely it cannot be argued that the Supreme Court may not constitutionally exercise judicial restraint.

The majority is also wrong in implicitly equating the denial of a particular *remedy* with the denial of federal jurisdiction itself. I do not suggest that the presence of CSRA precludes federal jurisdiction over civil servants' constitutional claims. Indeed, in *Hubbard* we declined to extend the plaintiff a *Bivens* remedy, but at the same time held he is entitled to pursue his constitutional claim seeking equitable relief.

Under my view of the law, federal employees alleging constitutional violations are entitled to pursue whatever administrative remedies CSRA offers. If they fail to obtain satisfactory resolution of their claim, they may seek equitable relief in federal court. Of course, some people (Spagnola, for example) will be unable to seek equitable relief because their claims are not justiciable (for example, the case is moot). But as Judge Wald notes in her concurrence in *Hubbard,* the number of cases in which a civil servant will be completely barred from federal court "should not be substantial." *Hubbard,* (Wald, J., concurring) at 15 n. 3.

Finally, I think the majority overlooks what was for the *Bush* Court a crucial special factor that compels judicial restraint. The Court analyzed the effect that damage actions would have on the incentive structure of civil service management

---

**13.** Four other Circuits that have addressed the issue presented in this case have reached this same conclusion. *See, e.g., Pinar v. Dole,* 747 F.2d 899 (4th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985); *Hallock v. Moses,* 731 F.2d 754 (11th Cir.1984); *Braun v. United States,* 707 F.2d 922 (6th Cir. 1983); *Broadway v. Block,* 694 F.2d 979 (5th Cir.1982). The Ninth Circuit, in a 2–1 decision, recently granted a *Bivens* remedy to a similarly situated plaintiff after analyzing *Bush* in much the same way the majority in the instant case does today. *Kotarski v. Cooper,* 799 F.2d 1342 (9th Cir.1986). I find the *Kotarski* decision no more persuasive than the majority opinion.

**14.** To be sure, the majority ultimately concludes that Congress could not have intended to fore-

close *Bivens* remedies for civil servants. But the majority's logic is (A) Congress could not constitutionally preclude civil servants' *Bivens* claims by simply giving them a right to petition OSC; (B) Congress does not want to do unconstitutional things; therefore (C) Congress must have intended to allow *Bivens* claims to remedy prohibited personnel practices. The key step in the majority's analysis is clearly the first one.

**15.** The Supreme Court considers policy implications when deciding whether to extend the availability of the *Bivens* remedy. *See Hubbard* at 7 (quoting *Bivens,* 403 U.S. at 407, 91 S.Ct. at 2010 (Harlan, J., concurring)).

as a "special factor[ ] counselling hesitation before authorizing a new kind of federal litigation." *Bush,* 462 U.S. at 378, 103 S.Ct. at 2411. Presented with strong arguments from the government as to the negative effect on legitimate supervision of the threat of subordinates' damage actions, Justice Stevens said:

> The costs associated with the review of disciplinary decisions are already significant—not only in monetary terms, but also in the time and energy of managerial personnel who must defend their decisions.... [I]t is quite probable that if management personnel face the *added risk* of personal liability for decisions that they believe to be a correct response to improper criticism of the agency, they would be deterred from imposing discipline in future cases.

462 U.S. at 388–89, 103 S.Ct. at 2416–17 (emphasis added). The Court declined to impose a new form of legal liability on supervisors, reasoning that Congress is in a far better position than a court to establish the proper balance between governmental efficiency and the rights of employees.

The Court's recognition of the undesirable side effects of creating a new *Bivens* action as a "special factor counseling restraint" applies with equal force to the case at bar. If inflicting minor discipline (or harassment) redressable only by petition to the OSC could give rise to a damage action whereas inflicting stronger penalties could not, supervisors would have an obvious incentive to choose the more draconian punishment when it might not be appropriate.[16] Since a 15–day suspension will immunize a supervisor against a damage action (by creating a CSRA right of judicial review)[17] it is hard to imagine a supervisor ever choosing a lesser suspension—even if the lesser penalty would otherwise be called for.[18]

Clearly then, a *Bivens* remedy is not an appropriate supplement to the CSRA remedial system. Such a remedy is inconsistent with the congressional plan because it would induce federal supervisors to behave in a fashion inconsistent with what CSRA contemplates. Moreover, it subjects federal employees to the likelihood of unjustifiably severe punishment. Under these circumstances, invoking judicial power to impose *Bivens* litigation on the civil service seems disdainful of the legislative branch. I would therefore decline the invitation to second-guess Congress.

### ORDER

PER CURIAM.

The *sua sponte* suggestions for *en banc* consideration have been circulated to the full Court. A majority of the judges of the Court in regular, active service have voted in favor of the suggestions. Accordingly, it is

ORDERED, by the Court *en banc,* that the issue at Part II of the opinion of December 5, 1986 in *Spagnola* and at Part III of the December 5, 1986 opinion in *Hubbard v. EPA,* 809 F.2d 1, will be considered and decided by the Court sitting *en banc.* It is

---

**16.** The Merit System Protection Board ("MSPB") may impose as sanctions "removal, reduction in grade, debarment from federal employment for a period not to exceed five years, suspension, reprimand or an assessment of a civil penalty *not to exceed $1,000*" on an employee against whom the OSC has brought a complaint of prohibited personnel practices. 5 U.S.C. §§ 1206(g) and 1207(b) (1982) (emphasis added). But undoubtedly almost any supervisor would prefer to take his chances with the OSC and the MSPB rather than face the hazards of a damage action, with or without a jury trial.

**17.** An employee suspended for 15 days or more has suffered an "adverse action," entitling him to appeal the action to the MSPB, and seek judicial review if necessary. *See* 5 U.S.C. §§ 7512, 7513(d), 7703 (1982). An employee suspended for 14 days or less has still suffered an "adverse action," but has no right of appeal to the MSPB or judicial review. *See* 5 U.S.C. §§ 7501–7504 (1982).

**18.** Of course, it is possible that, under the majority's approach, the damage action will not lie if an injunctive remedy turns out to be available. Indeed, Judge Wald takes this position in her *Hubbard* concurrence. But I doubt the possibility of injunctive relief precluding a *Bivens* action will give a supervisor much comfort. The mere prospect of a damage action will condition the supervisor's behavior to avoid the risk. *See Hubbard* at 8–10.

FURTHER ORDERED, by the Court *en banc,* that Part II of the December 5, 1986 opinion in *Spagnola* and Part III of the December 5, 1986 opinion in *Hubbard* be, and the same hereby are, vacated. All other parts of the opinions remain as issued on December 5, 1986.

A future order will govern further proceedings herein.