M. Dennis SCULIMBRENE, Plaintiff,

v.

Janet RENO, et al., Defendants.

No. CIV.A. 99–2010(CKK).

United States District Court,
District of Columbia.

Feb. 16, 2001.

Paul J. Orfanedes, Klayman & Associates, PC, Larry E. Klayman, Judicial Watch, Inc., Washington, D.C., for Plaintiff.

Anne L. Weissman, John Russell Tyler, U.S. Dept. of Justice, Timothy B. Mills, Patton Boggs, L.L.P., Washington, D.C., Thomas P. Ryan, McCarthy, Wilson & Ethridge, Rockville, MD, for Defendants.

MEMORANDUM OPINION

KOLLAR-KOTELLY, District Judge.

This case comes before the Court on a joint motion to dismiss filed by Defendants Jack Quinn and Howard Shapiro. The facts and circumstances of this case arise out of Plaintiff Dennis Sculimbrene's employment with the Federal Bureau of Investigation ("FBI") and his work at the FBI's White House Liaison Office. Plaintiff alleges that Defendant FBI violated the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and that Defendant Executive Office of the President ("EOP") violated the Privacy Act, 5 U.S.C. § 552a. Plaintiff also alleges that Defendants Jack Quinn, How-

ard Shapiro, Lanny Davis, and unnamed Defendants John and Jane Does Nos. 1–5 violated the Ku Klux Klan Act, 42 U.S.C. §§ 1985(1) and 1985(2), and in addition, that these same Defendants, with the exclusion of Mr. Davis, violated Plaintiff's rights under the First and Fifth Amendments of the United States Constitution. In this Memorandum Opinion, the Court addresses only the motion to dismiss filed by Defendants Jack Quinn and Howard Shapiro.

## I. BACKGROUND

Plaintiff Sculimbrene is a former employee of the FBI who, during his employment, was on detail to the White House Liaison Office at the time the Clinton Administration assumed control of the White House in early 1993. Agent Sculimbrene's detail duties required him to conduct background interviews of White House executives and staff, as well as other detailees, volunteers, and contractors requiring access to the White House. *See* Complaint ¶ 13. To provide some context to the following discussion, it is helpful to recite some of the general allegations set forth in Plaintiff's Complaint:

Plaintiff alleges that, in early March 1993, three White House officials associated with the Clinton Administration "tried to question Plaintiff about the backgrounds and political views of the staff of the White House Travel Office." *Id.* ¶ 17. After declining to reveal any information, Plaintiff notified his supervisor about the questioning and expressed his belief that the White House was "using" the FBI to provide an excuse to terminate the Travel Office employees. *See id.* ¶¶ 18, 19.

Around the same time, Plaintiff conducted several interviews in conjunction with the background investigation of David Craig Livingstone, who was then a candidate for appointment as Director of the White House Office of Personnel Security. *See id* ¶ 20. As part of routine procedure in relation to that investigation, Plaintiff interviewed White House Counsel Bernard Nussbaum. *See id* ¶ 21. Nussbaum allegedly related to Plaintiff that "he did not know Livingstone well, but that he had been highly recommended by Hillary Clinton, who apparently knew Livingstone's mother." *Id.* ¶ 22. Plaintiff then prepared a memorandum, formally called an "insert," which reflected the information obtained from Nussbaum regarding the alleged relationship between Hillary Clinton and Livingstone's mother. *See id.* ¶ 23. The insert was allegedly sent to the FBI's Washington Field Office, where it was to have been placed in Livingstone's permanent FBI file. *See id.* ¶ 24.

In May 1993, the White House publicly announced that the White House Travel Office staff was being terminated for alleged financial improprieties and that the FBI would soon commence a criminal investigation. *See id.* ¶ 27. The firing of the Travel Office was suspected, by some, to have been politically motivated. *See id.* ¶ 28. As a result, the facts and circumstances surrounding the firing evolved into a political scandal known as "Travelgate." *See id.* ¶ 29. Travelgate eventually became the subject of congressional hearings and was the subject of investigation by Independent Counsel Kenneth Starr. *See id.* ¶ 30.

Shortly after the Travel Office firings were announced in May of 1993, Plaintiff claims to have witnessed numerous "unknown persons going through files and throwing items away, which appeared to be official documents," in the White House Travel Office. *See id.* ¶ 31. Around the same time, Plaintiff claims to have advised his immediate supervisor, Supervisory Special Agent ("SSA") Thomas Reneghan, and SSA David Bowie, "the supervisor of

the criminal case that was eventually brought against former White House Travel Office Director Billy Dale, that he was concerned about chain of custody issues." *Id.* at ¶ 32. Plaintiff further recommended that the FBI interview him, and provided a memorandum to his immediate supervisor setting forth his observations and concerns. *See id.* Plaintiff was interviewed on the subject in 1995. *See id.*

In early November 1995. Agent Sculimbrene testified as a defense witness at the criminal trial of Billy Dale, the former head of the White House Travel Office. *See id.* ¶ 60. According to Agent Sculimbrene, his testimony "received substantial press coverage, much of which was unfavorable towards the White House and the FBI." *Id.* ¶ 61. In early 1996, Plaintiff met with two representatives from the General Counsel's Office who had allegedly been sent by Howard Shapiro, General Counsel to the FBI, to meet with Agent Sculimbrene and his supervisor. *See id.* ¶ 72. During that meeting, Plaintiff claims to have confirmed that three White House officials had tried to obtain information from him about the White House Travel Office staff. *See id.* ¶ 73. Plaintiff also allegedly confirmed the accuracy of certain information which had been revealed in a manuscript written by Gary Aldrich, a former FBI Agent who had worked at the White House with Agent Sculimbrene. *See id.* ¶ 74. That manuscript, later published as a book entitled *Unlimited Access,* makes numerous references to Plaintiff and attributes several direct quotes to him. *See id.* ¶ 75.

On February 28, 1996. Plaintiff received notice that he was being investigated for unprofessional conduct. *See id.* ¶ 81. During an interview which was taken in conjunction with the investigation, Agent Sculimbrene learned of an anonymous letter which allegedly included some of the charges of unprofessional conduct. *See id.* ¶¶ 86–88. Plaintiff claims to have not seen the letter at that time. The investigation into Plaintiff's alleged unprofessional conduct was eventually closed in the spring of 1996. *See id.* ¶ 99.

On May 24, 1996, Agent Sculimbrene filed an administrative complaint against the FBI alleging that the FBI had unlawfully removed certain reasonable employment accommodations which had been granted to Plaintiff following a head injury he suffered in early 1994 outside of work. *See id.* ¶ 100. That complaint was ultimately denied, on April 24, 1999. *See id.* ¶ 142.

In early June 1996, reports of a new political scandal—"Filegate"—appeared, alleging that Livingstone and a detailee assigned to the White House Office of Personnel Security obtained FBI background investigation summaries on numerous former Reagan and Bush Administration employees. *See id.* ¶ 103. Like Travelgate, Filegate became the subject of Congressional hearings and an investigation by Independent Counsel Starr. *See id.* ¶¶ 104, 105. In June of 1996. Plaintiff gave an unsworn interview to the Senate Judiciary Committee concerning Filegate wherein Plaintiff relayed his opinion regarding the "chaotic management" of the White House Personnel Security Office and the alleged connection between Livingstone and Hillary Clinton. *Id.* ¶¶ 106–108. Plaintiff also told the Committee that "he was concerned he was being retaliated against for testifying on behalf of Mr. Dale at Mr. Dale's criminal trial." *Id.* ¶ 111. The following month, Plaintiff gave a sworn deposition to the House of Representatives, wherein he linked Livingstone's hiring to the First Lady. *See id.* ¶ 115. Plaintiff further alleges that "on or about the same day" as his deposition before the House, FBI General Counsel

Howard Shapiro alerted the White House that the FBI had found the Nussbaum "insert." *See id.* ¶ 116. The day following his testimony, two FBI agents were dispatched to Plaintiff's home to interview him about the "insert" related to his three-year-old interview with Nussbaum regarding Livingstone. *See id* ¶¶ 117, 118.

Plaintiff alleges that on July 25, 1996, White House Counsel Jack Quinn sent a letter to FBI director Louis Freeh regarding Plaintiff's insert about Livingstone. *See id.* ¶ 126. Sculimbrene further asserts that "FBI General Counsel Howard Shapiro, other, unknown White House officials and agents, and other unknown FBI officials participated" in the drafting of that letter and that Shapiro "reviewed different drafts" of the letter. *Id.* ¶¶ 127, 128. On July 26, 1996, Lanny J. Davis, a media commentator, appeared on CNN's *Cross-Fire* and attacked Plaintiff's credibility. *Id.* ¶ 130. A few days later, Mr. Davis appeared on CNBC's *Rivera Live* and made similar statements. *Id.* ¶ 131. Plaintiff alleges that Mr. Davis "communicated with [Jack] Quinn, [Howard] Shapiro and other currently unknown White House officials and agents to discuss what he would say about Plaintiff" on the aforementioned programs. *Id.* ¶ 135.

Plaintiff contends that, on March 5, 1998, he "was forced to take an early retirement from the FBI as a result of the . . . false accusations and disparagement to which he had been subjected, and the other, unwarranted retaliation and harassment alleged herein ." *Id.* ¶ 139. Relevant to the instant motion. Plaintiff alleges that Defendants Quinn and Shapiro conspired with each other and others, in violation of 42 U.S.C. § 1985(1), to "injure Plaintiff in his person and property on account of the lawful discharge of his duties," and, in violation of 42 U.S.C. § 1985(2), to similarly injure Plaintiff "on account of Plaintiff's having provided testimony in a court of law of the United States." *Id.* ¶¶ 155, 156. Plaintiff also alleges that Defendants Quinn and Shapiro, "acting under color of law," deprived Plaintiff of his First and Fifth Amendment rights. *Id.* ¶¶ 159, 160.

## II. LEGAL STANDARD

This Court will not grant a motion to dismiss for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Accordingly, at this nascent stage in the litigation, the Court assumes the veracity of all factual allegations forwarded by the Complaint. *See Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1102 (D.C.Cir.1985). Moreover, "[t]he complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged." *Schuler v. United States,* 617 F.2d 605, 608 (D.C.Cir.1979). Nonetheless, the Court is not bound to accept the legal conclusions of the non-moving party. *See Taylor v. FDIC,* 132 F.3d 753, 762 (D.C.Cir.1997).

## III. DISCUSSION

Defendant White House Counsel Jack Quinn and Defendant FBI General Counsel Howard Shapiro ("Quinn and Shapiro") jointly move to dismiss the claims alleged against them, Counts III and IV of Plaintiff's Complaint.[1] Plaintiff presents two

---

1. Pursuant to those same claims, Plaintiff also names as defendants "John and Jane Does

Nos. 1–5," alleging that unknown persons at the White House and/or FBI participated in

distinct claims against Quinn and Shapiro. In Count III, Plaintiff alleges violations of 42 U.S.C. § 1985(1) and (2). In Count IV, Plaintiff alleges violation of his First and Fifth Amendment rights, for which he seeks monetary redress thorough a *Bivens* action. Quinn and Shapiro argue that they are entitled to dismissal on the grounds that the Civil Service Reform Act ("CSRA") precludes all of Plaintiff's claims against them.

█ The CSRA governs the relationship between the federal government and its employees, providing "a comprehensive system for reviewing personnel action taken against federal employees." *USIA v. Krc,* 989 F.2d 1211, 1217 (D.C.Cir.1993) (quoting *United States v. Fausto,* 484 U.S. 439, 455, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988)). As a result, the CSRA generally "precludes district courts from taking jurisdiction over CSRA-related claims." *Steadman v. Governor, United States Soldiers' & Airmen's Home,* 918 F.2d 963, 967 (D.C.Cir.1990) (citing *Karahalios v. Nat'l Fed'n of Fed. Employees, Local 1263,* 489 U.S. 527, 533, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989)).

█ Plaintiff insists that the comprehensive nature of the CSRA is irrelevant to his claims against Quinn and Shapiro for two reasons. First, Plaintiff asserts that his alleged injuries do not fall within the purview of a "personnel action" under the terms of the CSRA. *See* Pl. Opp. to Quinn and Shapiro's Mot. to Dismiss ("Pl. Opp. to Q & S Mot.") at 14–16. Second, Plaintiff argues that the conduct which forms the basis for his complaint does not arise out

of his employment with the FBI, as neither Quinn nor Shapiro had "authority to take, direct others to take, recommend or approve any personnel action" with respect to Plaintiff. *Id.* at 15 (quoting 5 U.S.C. § 2302(b)).

In Counts III and IV of his Complaint, Plaintiff alleges that Defendants Quinn and Shapiro caused injury to his "person and property" and injury to his "good name" and "reputation," resulting in, among other things, loss of income. Complaint ¶¶ 155–57; 160–61. Plaintiff's theory of the case alleges that Quinn and Shapiro, in concert with others, subjected him to arbitrary action and coercion for political purposes. For example, Plaintiff alleges that he "was forced to take an early retirement from the FBI as a result of the . . . false accusation and disparagement to which he had been subjected, and the other, unwarranted retaliation and harassment alleged herein." Complaint ¶ 139. In addition, one of Plaintiff's main complaints against Defendants Quinn and Shapiro is that they allegedly wrote a letter to FBI Director Louis Freeh, who presumably does have supervisory authority over Agent Sculimbrene, accusing Agent Sculimbrene of fabricating the Livingstone insert. Complaint ¶ 126; Pl. Opp. to Q & S Mot. at 2. Having placed the blame on Defendants Quinn and Shapiro for his allegedly forced early retirement and the loss of some privileges of his employment, it seems self-contradictory and disingenuous for Plaintiff to now argue that his Count III and Count IV claims bear no relation to his employment with the FBI.

the retaliatory actions allegedly taken by Quinn and Shapiro. Complaint ¶¶ 155, 159. In their motion to dismiss, or in the alternative, for summary judgment, Defendants Quinn and Shapiro indicate that they make their argument on behalf of themselves, as well as the unnamed defendants. *See* Q & S Mot. at 2 n. 2. It does not appear that Plaintiff

opposes such treatment of the unnamed defendants. *See generally.* Pl. Opp. to Q & S Mot. Accordingly, the Court's analysis of the motion filed by Defendants Quinn and Shapiro shall apply equally to John and Jane Does Nos. 1–5. However, for ease of reference, the Court's discussion will refer only to Defendants Quinn and Shapiro.

Addressing each of Plaintiff's arguments in turn, the Court must first reject Plaintiff's assertion that his claims "do not arise from Plaintiff's employment relationship with the FBI or from any personnel action taken against Plaintiff by his supervisors." Pl. Opp. to Q & S Mot. at 16. Agent Sculimbrene's employment by the FBI cannot be separated from his claims against Quinn and Shapiro because "[h]is position as a federal employee is central to his complaints, and it is this employment relationship that the Supreme Court emphasized in *Bush* and its progeny, rather than the nature of the specific violation involved." *Lombardi v. Small Bus. Admin.*, 889 F.2d 959, 961 (10th Cir.1989).[2] Moreover, according to applicable and binding precedent, whether or not the complained of harm falls within the definition of "personnel action" in Section 2302 is not relevant to a determination of whether the CSRA governs Plaintiff's claims. *Bush v. Lucas*, 462 U.S. 367, 385, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983).

"Federal civil servants are now protected by an elaborate, comprehensive scheme that encompasses substantive provisions forbidding arbitrary action by a supervisor." *Id.* An employee's rights under the CSRA are grounded in the identification of certain "merit system principles." 5 U.S.C. § 2301(b). One such merit principle, relevant to the allegations in the present action, provides that "all employees . . . should receive fair and equitable treatment in all aspects of their personnel management . . . with proper regard for their . . . constitutional rights." *Id.* § 2301(b)(2). The recognition of these principles in Section 2301 is not undercut by the fact that the subsequent statutory

section prohibits only certain kinds of behavior by federal officials which stand in derogation of these merit system principles. *See id.* § 2302; *Bush*, 462 U.S. at 385, 103 S.Ct. 2404. The *Bush* Court acknowledged as much, stating that administrative procedures "apply to a multitude of personnel decisions," but "[n]ot all personnel actions are covered." *Id.* at 385 n. 28, 103 S.Ct. 2404. "The absence of statutory relief for a constitutional violation, for example, does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation." *Schweiker v. Chilicky*, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370. 421–22 (1988).

In this regard, Plaintiff's argument that he is entitled to a remedy outside of the CSRA because Defendants Quinn and Shapiro are not the persons identified in Section 2303(b) resembles the claim of the plaintiff in *Fausto*, which the Supreme Court rejected. *See Fausto*, 484 U.S. at 450–51, 108 S.Ct. 668. The plaintiff in *Fausto* argued that his exclusion from the definition of employee under the terms of the CSRA "leaves [him] free to pursue other avenues of review." *Id.* at 449, 108 S.Ct. 668. In a similar, though admittedly, not identical, vein, Plaintiff in this case argues that he is entitled to seek remedies outside of the CSRA because, in his view, Quinn and Shapiro do not possess the authority described in Section 2302(b). The Supreme Court has already rejected this type of exclusion-based argument as "implausible," and this Court must do the same. *Id.* at 451, 108 S.Ct. 668.

The comprehensive nature of the CSRA indicates that congressional silence on the

---

**2.** Plaintiff's complained of action does, in fact, arise out of his employment with the FBI. The CSRA makes clear that its purpose includes protecting employees "against arbitrary action . . . or coercion for partisan polit-

ical purposes." 5 U.S.C. § 2301(b)(8)(A). Plaintiff complains of exactly that type of action, stating that he is "yet another victim of the Clinton White House smear machine." Pl. Opp. to Q & S Mot. at 1.

coverage of certain personnel actions, in this case, actions taken by non-supervisory employees, was not inadvertent. *See id.* at 455, 108 S.Ct. 668; *see also Tahy v. United States,* 189 F.3d 478 (table), 1999 WL 651388 at *3 (10th Cir.) ("Since [plaintiff's] claim against non-supervisory employees relates exclusively to the effect of their actions on subsequent federal employment decisions against him, it would be inappropriate to circumvent the CSRA scheme ....."). Accordingly, the rule that the CSRA is the exclusive remedy for aggrieved federal employees shall preclude Plaintiff from resorting to 42 U.S.C. § 1985 and from bringing *Bivens* actions in order to recover against the individual defendants. *See Spagnola v. Mathis,* 809 F.2d 16, 28–30 (D.C.Cir.1986) (*Spagnola I*), *on reh'g en banc,* 859 F.2d 223 (D.C.Cir.1988) ("*Spagnola II*").[3] To allow either of these claims to proceed would permit Plaintiff to impermissibly circumvent the CSRA.

Specifically with regard to Section 1985(1), this Circuit's law is clear: "Congress meant the CSRA to be the exclusive statutory remedy for aggrieved federal employees and thereby foreclosed [ ] resort to Section 1985(1)." *Spagnola I,* 809 F.2d 16, 28 (D.C.Cir.1987). By a similar rationale, it appears that Plaintiff's Section 1985(2) claims are also precluded by the CSRA. The *Spagnola I* court's determination that the CSRA precludes the plaintiff's Section 1985(1) claim flows from a series of D.C. Circuit cases which apply the principle set forth in *Brown v. GSA,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402

(1976), that "a precisely drawn, detailed statute preempts more general remedies." *Spagnola I.* 809 F.2d at 30 (quoting *Brown,* 425 U.S. at 834, 96 S.Ct. 1961) (internal quotations omitted). The "unifying thread" in that series of cases which rely upon *Brown* "seems to be that the CSRA precludes resort to other statutory schemes for aggrieved federal employees raising non-constitutional claims against their employers." *Spagnola I,* 809 F.2d at 30.

In the context of a preclusion analysis, Section 1985(2) is not so distinguishable from Section 1985(1) that it merits different treatment. As with Section 1985(1), to permit Plaintiff to bring his claims under Section 1985(2) threatens to "impermissibly frustrate" the "exhaustive remedial scheme of the CSRA." *Id.* Therefore, Plaintiff's claims under Section 1985(1) and (2) against Defendants Quinn and Shapiro are precluded.

■ As is the case with Section 1985 claims, the D.C. Circuit, relying on the Supreme Court's opinions in *Bush v. Lucas* and *Schweiker v. Chilicky,* has held that constitutional *Bivens* claims are unavailable to supplement a federal employee's statutory remedies under the CSRA. *See Spagnola II,* 859 F.2d at 226. In *Bush,* based on the conclusion that "the administrative system created by Congress 'provides meaningful remedies for employees who may have been unfairly disciplined for making critical comments about their agencies,' the [Supreme] Court refused to create a *Bivens* action even though it assumed a First Amendment

---

**3.** On December 5, 1986, two panels of the United States Court of Appeals for the District of Columbia Circuit issued conflicting opinions regarding the availability of *Bivens* remedies in federal personnel actions for plaintiffs for whom the CSRA does not provide full relief. See *Hubbard v. EPA,* 809 F.2d 1, 6–11 (D.C.Cir.1986); *Spagnola,* 809 F.2d at 19–28.

On January 6, 1987, the full court vacated the conflicting portions of the two opinions and, on April 29, 1987, held a hearing *en banc.* The *en banc* court held that a court should not create a *Bivens* remedy for a claimant in Spagnola's (or Hubbard's) situation. *Spagnola II,* 859 F.2d at 223.

**8**

violation [had occurred] and acknowledged that 'existing remedies do not provide complete relief for the plaintiff.'" *Chilicky,* 487 U.S. at 423, 108 S.Ct. 2460 (summarizing and quoting the Supreme Court's holding in *Bush,* 462 U.S. at 386–388, 103 S.Ct. 2404). Likewise, the *Chilicky* Court noted that "[w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies." *Id.* Applying the analysis in *Bush* and *Chilicky* to the CSRA, the D C Circuit, in *Spagnola II,* concluded that the CSRA's preclusive affect holds true even with regard to constitutional *Bivens* claims brought by "those claimants within the system for whom the CSRA provides *'no remedy whatsoever.'* " *Spagnola II,* 859 F.2d at 228 (quoting *Chilicky,* 487 U.S. at 423, 108 S.Ct. 2460) (emphasis added). Thus, the availability of a remedy to a specific plaintiff under the CSRA is not dispositive of whether the CSRA shall preclude all other remedies, nor is there a need for a "case-by-case examination of the particular administrative remedies available to a given plaintiff." *Id.* Accordingly, Plaintiff's argument that the CSRA does not preclude his claims because it does not cover his claims must be rejected.

Finding that Congress has established the CSRA as a comprehensive system to administer public rights, that Congress had not "inadvertently" omitted damages remedies for certain claimants, and that Congress has not plainly expressed an intention that the courts preserve *Bivens* remedies, this Court concludes that Plaintiff's *Bivens* claims are precluded by the CSRA. *Id.* Accordingly, Plaintiff's *Bivens* claims against Defendants Quinn and Shapiro, like his Section 1985 claims against these same defendants, must be dismissed.

## IV. CONCLUSION

The Court has considered the relevant motion, opposition, reply and any supplemental briefing and, based on these documents and foregoing analysis, the Court concludes that Defendants Quinn and Shapiro's motion to dismiss shall be granted because Plaintiff's claims against Defendants Quinn and Shapiro are precluded by the CSRA. An appropriate Order accompanies this Memorandum Opinion.

## ORDER

This case comes before the Court on a Motion to Dismiss filed by Defendants Jack Quinn and Howard Shapiro, on behalf of themselves and John and Jane Does Nos. 1–5. Having considered Defendants' motion, and Plaintiff's Opposition thereto, and Defendants' Reply, for the reasons set forth in the accompanying Memorandum Opinion, it is, this 16 day of February, 2001, hereby

**ORDERED** that Defendants' Motion to Dismiss (# 15) is GRANTED.

**SO ORDERED.**